**COMMONWEALTH of Pennsylvania,**
**Appellee**

v.

**Gary MCCOY, Appellant**

**No. 1496 EDA 2015**

Superior Court of Pennsylvania.

Submitted September 12, 2016
FILED JANUARY 27, 2017

Karl Baker, Public Defender, Philadelphia, for appellant.

Hugh J. Burns, Jr., Assistant District Attorney, Philadelphia, for Commonwealth, appellee.

BEFORE: OTT, J., RANSOM, J., and STEVENS, P.J.E.*

OPINION BY OTT, J.:

Gary McCoy appeals from the judgment of sentence imposed on May 7, 2015, in the Court of Common Pleas of Philadelphia County. A jury convicted McCoy of persons not to possess firearms,[1] and the trial court sentenced McCoy to a term of four to eight years' incarceration, followed by two years' probation. Prior to trial, McCoy filed an omnibus motion, seeking to suppress "any and all physical evidence recovered by police as a result of an illegal stop."[2] Specifically, McCoy sought to suppress evidence of a firearm discarded during police pursuit. In this appeal, McCoy contends "the trial court err[ed] in denying [his] motion to suppress physical evidence, insofar as [he] was seized without reasonable suspicion that criminal activity was afoot or that he was armed and dangerous." McCoy's Brief at 3.[3] Based upon the following, we affirm.

The trial court made the following findings at the suppression hearing:

On January 24, 2014, Officer [Kelly] Robbins driving as the recorder of the vehicle being operated by her partner, Officer [Donald] Vandermay, were operating on Rosehill Street when they noticed [McCoy], who appeared to come onto the street via an alley. Due to his suspicious behavior, Officer Robbins, in an attempt to open up her door, saw [McCoy] flee, and she followed [McCoy]. Thereafter, she saw [McCoy] on Somerset Street throw a gun into a Mazda pickup truck. [McCoy] was subsequently apprehended. Officer Robbins testified she was working for an overtime detail, Mobile Field Force unit, that concentrates on high-crime areas and zones, specifically areas designated as high-crimes in shootings, VUFA arrests and armed robbery areas. Based on his behavior, she thought criminal activity could've been afoot, but he fled before she even had a chance to stop him or say anything to him.

I find that she had probable cause to pursue and reasonable suspicion to subsequently arrest.[4]

N.T., 12/18/2014, at 32–33.

■■■■ At the outset, we state our standard and scope of review:

Our standard of review in addressing a challenge to a trial court's denial of a suppression motion is limited to determining whether the factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct.

[W]e may consider only the evidence of the prosecution and so much of the evidence for the defense as remains

---

* Former Justice specially assigned to the Superior Court.

1. 18 Pa.C.S. § 6105.

2. N.T., 12/18/2014, at 4. *See* McCoy's Omnibus Motion, 5/7/2014.

3. McCoy timely complied with the trial court's order to file a Pa.R.A.P. 1925(b) statement, by filing his concise statement within the extension of time granted by the trial court. *See* McCoy's Statement of Errors Complained of on Appeal, 10/6/2015.

4. The trial court, in its opinion, clarified that the officers had "reasonable suspicion sufficient enough to permit a stop and thus, they could lawfully recover the contraband abandoned by [McCoy]." Trial Court Opinion, 12/3/2015, at 8.

uncontradicted when read in the context of the record as a whole. Where the record supports the findings of the suppression court, we are bound by those facts and may reverse only if the court erred in reaching its legal conclusions based upon the facts.

*Commonwealth v. Williams*, 2008 PA Super 6, 941 A.2d 14, 26–27 (Pa. Super. 2008) (*en banc*) (citations, quotations, and quotation marks omitted). Moreover, it is within the lower court's province to pass on the credibility of witnesses and determine the weight to be given to their testimony. *See Commonwealth v. Clemens*, 2013 PA Super 85, 66 A.3d 373, 378 (Pa. Super. 2013).

*Commonwealth v. Roberts*, 133 A.3d 759, 771 (Pa. Super. 2016), *appeal denied*, 145 A.3d 725 (Pa. 2016). Furthermore, our Supreme Court in *In the Interest of L.J.*, 622 Pa. 126, 79 A.3d 1073, 1085 (2013), clarified that the scope of review of orders granting or denying motions to suppress is limited to the evidence presented at the suppression hearing.

 Our resolution of McCoy's claim that he was "seized without reasonable suspicion" depends upon the nature of the encounter between police and McCoy.

There are three types of encounters between law enforcement officials and private citizens. A "mere encounter" need not be supported by any level of suspicion but carries no official compulsion to stop or respond. An "investigative detention" must be supported by reasonable suspicion and subjects the suspect to a stop and a period of detention, but it does not have the coercive conditions that would constitute an arrest. The courts determine whether reasonable suspicion exists by examining the totality of the circumstances. An arrest, or "custodial detention," must be supported by probable cause.

*In re J.G.*, 145 A.3d 1179, 1185 (Pa. Super. 2016) (citations omitted).

Here, McCoy argues, in part:

Appellant, Gary McCoy was walking out of an alley and down the street when a police car came creeping up beside him. It was 10:40 p.m. The patrol car suddenly stopped, right beside Mr. McCoy, and the officer started to jump out, with the full intent to stop him as the officer testified that she believed him to be engaged in criminal activity. The only bases for that belief were that they were in a bad neighborhood, and that Mr. McCoy paused briefly when he noticed the police car creeping up the street towards him. At that moment, Mr. McCoy reasonably believed that he was not free to leave, as it was clear that the officer was not just going to let him continue on his way. Under Pennsylvania law, Mr. McCoy was seized by the officer at that moment. Insofar as the officer did not have reasonable suspicion to stop Mr. McCoy, the seizure was illegal, and therefore the handgun that was eventually recovered should have been suppressed.

\*\*\*\*

Under the Pennsylvania Constitution, when an officer's initial seizure is not justified by reasonable suspicion nor probable cause, and a citizen subsequently flees and discards contraband, the "abandonment" of that contraband is deemed to be forced or coerced and the item in question must be suppressed. *Commonwealth v. Matos*, 543 Pa. 449, 672 A.2d 769 (1996).

McCoy's Brief at 7, 9–10. Based on our review, we disagree with McCoy's claim of trial court error. We find the record belies the version of facts set forth by McCoy in

his brief. Furthermore, we find McCoy's argument fails under relevant case law.

At the suppression hearing, on direct examination, Officer Robbins testified that on January 24, 2014, at 10:40 p.m., she was "in full uniform in a marked RPC," [5] patrolling a "high-crime neighborhood" [6] when she encountered McCoy. *See* N.T., 12/18/2014, at 5–8. She further testified:

> At that time and date, my partner and I were traveling northbound on the 2800 block of Rosehill. We were probably about, I'd say, about halfway up the block when I observed [McCoy]. ... He exited an alleyway on the right-hand side, which would've been the east side of the street. It was a dark alleyway. It was unlit. He exited the alleyway and started walking towards us, which would've been southbound on Rosehill Street. He was actually looking at the ground first; but when he looked in my direction, he paused in his walking—so he actually came to a full stop in his walk—and his eyes got big. He then proceeded to continue walking southbound slowly on the street.
>
> Based on my experience as an officer, based on the grid we were assigned in, all of the details that I already described for you—the time of night, the fact that Mr. McCoy was the only person out, it was freezing cold, all of those details—led me to believe that he was up to something criminal.
>
> At that time, I went to exit my vehicle. Mr. McCoy was looking directly at me. **As I opened my vehicle door, Mr. McCoy took off running southbound on Rosehill Street.** I jumped out of the vehicle. I gave chase to Mr. McCoy. We ran southbound on Rosehill. He then turned and ran westbound on Somerset.
>
> ****
>
> As I came around the corner onto Somerset, I observed Mr. McCoy throwing a silver handgun of some kind into the bed of a blue Mazda pick up truck that was parked on the south side of Somerset.
>
> ****
>
> ... At that time, I ran directly to the truck and retrieved from the bed of the truck ... a silver, .22 caliber revolver .... It was loaded with six rounds of ammunition.
>
> I retrieved the firearm from the bed of the truck and continued to chase Mr. McCoy. ...

N.T., 12/18/2014, at 8–10 (emphasis supplied).

In addition, Officer Robbins testified, as follows:

> Q. When you went to open the door to your vehicle, at any point in time, did you yell any commands to the defendant?
>
> A. No, I did not. I didn't have any time.
>
> Q. And did your partner at any point when you're making these initial observations yell anything, any verbal commands to the defendant?
>
> A. No, he did not.
>
> Q. And when the defendant actually began to take flight, where were you in the process of getting out of your vehicle.
>
> A. **He started running before I even had my right foot out of the vehicle.**
>
> Q. Okay. So up until that point, you had made no contact with the defendant; is that right?
>
> A. That's correct.

*Id.* at 11–12 (emphasis supplied).

Officer Robbins' cross-examination testimony further clarified she and Officer Vandermay were patrolling in a marked

---

5. N.T., 12/18/2014, at 6.

6. *Id.* at 7.

police vehicle, and travelling in the opposite direction of McCoy. *Id.* at 15–16. Officer Robbins stated she saw McCoy come out of an alleyway as Officer Vandermay was driving, and Officer Vandermay stopped the police vehicle "after about a car length." *Id.* at 17. Officer Robbins' door was closest to the east side, and McCoy was also on the east side of the street. *Id.* Officer Robbins stated McCoy "came out of the alleyway, started to walk southbound, made eye contact, stopped walking, continued walking, and when he got just past my door is when I went to open it." *Id.* at 18. She testified, "As soon as I open my door—actually as soon as I pull the handle and it makes a popping sound, that's when he started to run." *Id.*[7]

At the suppression hearing, McCoy's counsel contended that under the "totality of the circumstances test" there was a stop of McCoy. *Id.* at 30. Specifically, McCoy's counsel argued that "you have a marked police vehicle coming up right next to you within two feet of you, it stops for no reason and all of a sudden a uniformed police officer gets out of that car, clearly going to come towards you—," and "[a] person in [McCoy's] position would not have believed that he was free to leave." *Id.* at 30–31. McCoy's counsel asserted, "because that happened without reason-able suspicion to believe that [McCoy] had committed any kind of crime, everything after that is fruit of the poisonous tree. Under *Matos*, it's forced abandonment." *Id.* at 31.

The trial court denied the suppression motion, finding that "[McCoy] fled before [Officer Robbins] even had a chance to stop him or say anything to him." N.T., 12/18/2016, at 33. The facts of record support the trial court's determination.

As the trial court aptly stated during McCoy's counsel's argument, "The door starts to open and [McCoy] takes off, according to [Officer Robbins'] testimony. She doesn't get out of the car. She doesn't even approach him." *Id.* at 31. Our review confirms that the uncontradicted testimony of Officers Robbins and Vandermay established McCoy took flight after he saw police and before there was any police contact. Accordingly, we reject McCoy's argument that he "ran away and abandoned the handgun only after he had been seized absent reasonable suspicion or probable cause." McCoy's Brief at 11.

It bears emphasis that "the [Pennsylvania Supreme] Court and the United States Supreme Court have repeatedly held that a seizure does not occur where the police officers merely approach a person in public

---

7. On direct examination, Officer Donald Vandermay testified similarly:

> Q. Okay. So it's fair to say the first time you see him, he's near the opening of an alleyway, right?
> A. Yeah. He appeared—all of a sudden, he appeared from behind the house where the alleyway would be.
> Q. Okay. And that person is walking southbound on Rosehill, right?
> A. Correct, ma'am.
> Q. Okay. At the point when you see that person walking, you stop your car, right?
> A. Yes, ma'am.
> Q. And at that point, Officer Robbins opens her door, right?
> A. I believed she opened her door.

> Q. Okay. And at that point, you heard her say, "Come here," to that person who's walking down the street, correct.
> A. I did not hear that.
> Q. Okay. Did you hear her say anything to that person?
> A. I did not. I didn't hear her say anything at that point.
> Q. Okay. And at that point, she gets out of the car, right?
> **A. Your client starts running. And then she gets out.**
> Q. And then she gets out?
> A. Yes, ma'am.
> Q. Okay. And you remain in the car, right?
> A. Yes, ma'am.
> N.T., 12/18/2014, at 26–27 (emphasis added).

and question the individual or request to see identification." ***Commonwealth v. Lyles***, 626 Pa. 343, 97 A.3d 298, 303 (2014). Here, the officers' initial action was—if anything—a mere encounter, which does not need to be supported by any level of suspicion and requires no obligation to stop or respond. ***See In the Interest of D.M.***, 566 Pa. 445, 781 A.2d 1161, 1164–1165 (2001) ("[P]olice may approach anyone in a public place to talk to him, without any level of suspicion, but the citizen 'has a right to ignore the police and go about his business.'"). ***See also Roberts, supra***, 133 A.3d at 772 (concluding interaction was mere encounter when police officer exited the vehicle and asked "what's going on, what are you doing[?]").

■ Furthermore, it is well settled that unprovoked flight in a high crime area is sufficient to create a reasonable suspicion to justify an investigatory stop. ***In the Interest of D.M., supra***, at 1163–1164. ***See also Commonwealth v. Washington***, 51 A.3d 895, 898 (Pa. Super. 2012) ("nervous, evasive behavior and headlong flight all provoke suspicion of criminal behavior in the context of response to police presence"). Therefore, as the trial court correctly opined, McCoy's "evasive and suspicious behavior in a high crime area on a particularly cold winter night, along with his unprovoked flight and the officers' extensive years of training and experience, gave the officers reasonable suspicion that criminal activity was afoot." Trial Court Opinion, 12/3/2015, at 7. Because police possessed reasonable suspicion, their pursuit of McCoy was lawful. ***See In the Interest of D.M., supra*** at 1164 (police pursuit of a citizen constitutes a seizure, which must be supported by probable cause to make the seizure or reasonable suspicion to stop and frisk). Accordingly, McCoy is not entitled to suppression of the gun he discarded during his flight. ***See***

***Commonwealth v. Cook***, 558 Pa. 50, 735 A.2d 673, 675 (1999) (where police possess reasonable suspicion to stop a suspect, they may lawfully recover contraband abandoned by the suspect during flight).

Judgment of sentence affirmed.