J-S40003-17

2017 PA Super 208

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
:
v. :
:
:
:
JULIUS BROCKMAN :
:
Appellant : No. 2435 EDA 2016

Appeal from the Judgment of Sentence June 13, 2016
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0002709-2015

BEFORE: OTT, DUBOW, JJ., and STEVENS, P.J.E.[*]

OPINION BY STEVENS, P.J.E.: **FILED July 5, 2017**

Appellant Julius Brockman appeals the judgment of sentence entered

in the Court of Common Pleas of Philadelphia County on June 13, 2016, at

which time he was sentenced to an aggregate term of four (4) years to eight

(8) years in prison following a stipulated bench trial. We affirm.

The trial court aptly set forth the relevant procedural history and facts

herein as follows:

**PROCEDURAL HISTORY**

The Commonwealth charged Appellant with violating
sections 6105, 6106, and 6108 of the Uniform Firearms Act (18
Pa. C.S.A. §§ 6105, 6106, and 6108), possessing with intent to
deliver a controlled substance (35 P.S. § 780-113(a)(30)), and
knowingly or intentionally possessing a controlled substance (35
P.S. § 780-113(a)(16)). On April 11, 2016, Appellant brought a
pretrial motion to suppress physical evidence, which this [c]ourt

---

[*] Former Justice specially assigned to the Superior Court.

denied. A bench trial followed and this [c]ourt found Appellant guilty of the above-referenced crimes.

On June 13, 2016, this [c]ourt sentenced Appellant to three (3) to six (6) years' incarceration for violating section 6106 of the Uniform Firearms Act, one (1) to two (2) years' consecutive incarceration for violating section 6105 of the Uniform Firearms Act, and three (3) years' probation for violating section 6108 of the Uniform Firearms Act. This [c]ourt imposed no further sentence for Appellant's remaining convictions and his aggregate sentence therefore is four (4) to eight (8) years' incarceration followed by three (3) years' probation.

On June 22, 2016, Appellant filed a post-sentence motion for reconsideration of sentence, which this [c]ourt denied on June 30, 2016. On July 28, 2016, Appellant filed a Notice of Appeal to the Pennsylvania Superior Court, and on October 18, 2016, Appellant filed a Statement of Matters Complained of on Appeal pursuant to Pa. R.A.P. No. 1925(b).

## MATERIAL FACTS

Appellant brought a motion to suppress a firearm and crack cocaine that he discarded onto a public street in Philadelphia, Pennsylvania. At the suppression hearing, the Commonwealth presented the testimony of Philadelphia Police Detective Michael Rocks (Detective Rocks), and Philadelphia Police Officer Alexander McChord (Officer McChord).

Detective Rocks testified that he was assigned to investigate a shooting that occurred on December 12, 2014, around the 2500 block of North 30th Street in the city and county of Philadelphia, Pennsylvania. Pursuant to his investigation, Detective Rocks received information from another police officer, Officer Calabrese, who spoke to the shooting victim at the hospital. Officer Calabrese advised Detective Rocks that the victim stated "he couldn't believe Ju Ju shot Him." The victim also provided Officer Calabrese a physical description of "Ju Ju" (e.g., height and weight), which Officer Calabrese relayed to Detective Rocks. Thereafter, Detective Rocks "reviewed numerous photographs" from files relating to previous pedestrian stops in the shooting area. Based on the suspect's nickname, physical description, and the neighborhood of the shooting, Detective Rocks ultimately developed Appellant as the suspected shooter.[1] (Id. at pgs. 5-10, 16-18).[2]

On December 23, 2014, after already developing Appellant as a suspect, Detective Rocks received a phone call at Central Detectives from a female identifying herself as the victim's girlfriend. The girlfriend advised that "the male that shot her boyfriend was standing on the 2600 block of North 30th Street ... wearing a grey jacket and jeans."[3] The girlfriend did not identify the alleged shooter by name but provided Detective Rocks a "clothing description." Detective Rocks subsequently called Officer McChord and his partner (Officer D'Amico), who were uniformed patrol officers in the area, and "asked them to go to that location to see if they observed the male who matched that description[.]" In addition to relaying the girlfriend's "clothing description" of the person she identified as the shooter, Detective Rocks informed Officer McChord that *his* suspect's name in the shooting was Julius Brockman (*i.e.*, Appellant). Although Appellant was still only a suspect and no arrest warrant had been issued for him, Detective Rocks requested that if the officers saw Appellant at the described location, "to stop him and bring him to Central Detectives for investigation." (Id. at pgs. 10-12).

Officer McChord already knew Appellant "from seeing him in the neighborhood" and because his partner "arrested him earlier that year." Upon arriving at the above-referenced location, Officer McChord, who was the front seat passenger in the patrol car, recognized Appellant walking down the block with another male. Officer D'Amico pulled the patrol car beside Appellant and Officer McChord then "opened up the door and told [Appellant] to stop." (Id. at pgs. 20-25).

Officer McChord testified that he "told [Appellant] to stop right there" in a "normal manner" - *i.e.*, Officer McChord neither yelled stop nor said it with a "soft voice." Moreover, Officer McChord kept his firearm holstered and no lights or sirens were activated on the patrol vehicle. Officer McChord testified that his "whole point" of stopping Appellant was not to arrest him but "for investigation purposes." (Id. at pgs. 23-24).

As soon as Officer McChord told Appellant to stop, Appellant "immediately reached for his front right side of his waistband holding on to something and then fled." Officer McChord believed Appellant was clutching a firearm in his waistband because he had seen individuals clutch firearms in such manner between fifteen (15) and twenty (20) occasions. In Officer McChord's experience, when someone keeps an unholstered firearm in his/her waistband, he/she must grasp the

weapon while running or it will fall out of his/her waistband. (Id. at pgs. 24-29).

As Appellant fled the officers, Officer McChord observed him remove from his waistband a black handgun and a "clear bag," both of which Appellant dropped in front of a black SUV parked on the street. Although Officer McChord eventually lost sight of Appellant when the latter ran down a side street, his partner (Officer D'Amico) arrested Appellant the very next day pursuant to an arrest warrant. (Id. at pgs. 24-29).

Before trial, Appellant moved to suppress the firearm and "clear bag" that he discarded while fleeing from the officers. Appellant claimed Officer McChord had initially ordered him to stop without reasonable suspicion that Appellant was engaging in criminal activity *at that time*. Appellant therefore claimed that the discarded items were fruits of a "forced abandonment" precipitated by an unlawful seizure. (Id. at pgs. 32-35, 42-43).

This [c]ourt denied Appellant's motion and thereafter conducted a stipulated bench trial. Appellant stipulated that Officer McChord would testify at trial that he recovered the "clear bag" that Appellant discarded, and that the bag contained thirty-five (35) "clear plastic Ziploc packets" of crack cocaine. Officer McChord also would testify that the firearm Appellant had discarded was placed on a property receipt and was "test fired and ... found to be operable." Appellant further stipulated that the Commonwealth's expert, "Officer Keys," would testify that he "reviewed the file" and heard the testimony, and expertly opines that the crack cocaine Appellant discarded "was possessed with the intent to deliver." In addition to the stipulated testimony, the Commonwealth submitted a Certificate of Nonlicensure and a criminal "extract indicating [Appellant] is ineligible to possess a firearm in Pennsylvania." (Id. at pgs. 50-51).

Based on the above evidence, this [c]ourt found Appellant guilty of unlawfully possessing a firearm (18 Pa. C.S.A. § 6105), carrying a firearm without a license (18 Pa. C.S.A. § 6106), unlawfully carrying a firearm on the public streets of Philadelphia (18 Pa. C.S.A. § 6108), possessing with intent to deliver a controlled substance (35 P.S. § 780-113(a)(30)), and knowingly or intentionally possessing a controlled substance (35 P.S. § 780-113(a)(16)). (Id. at pg. 52). For Appellant's firearms convictions, this [c]ourt sentenced him to an aggregate term of four (4) to eight (8) years' incarceration, followed by three (3) years' probation. This [c]ourt imposed no sentence for Appellant's narcotics convictions. (N.T., 6/13/16, pgs. 19-20.

_____

- 4 -

[1]Detective Rocks testified that Appellant had a tattoo on his body that stated, "Ju Ju." However, the Commonwealth subsequently stipulated that if Appellant testified, he would exhibit to the [c]ourt that he had no tattoo bearing the name Ju Ju. (Id. at pgs. 18, 29).

[2] Detective Rocks testified that the victim was "uncooperative" in the investigation and refused to give a statement about the incident, notwithstanding the detective's several attempts to interview him. Because the victim refused to cooperate, Detective Rocks did not show him photographs of Appellant for purposes of identification. (Id. at pgs. 19-20).

[3] Detective Rocks testified that he believes this female obtained his phone number from his work card that he left at the hospital with the victim. Although Detective Rocks never met this female in person or formally interviewed her at the police station, she had called him "several times" between the day of the shooting and December 23rd. (Id. at pgs. 13-14).

Trial Court Opinion, filed 12/13/16, at 1-5 (emphasis in original).

In his brief, Appellant presents the following Statement of the Questions Involved:

> A.    Did the lower court abuse its discretion when it denied Appellant's motion to suppress, where Appellant was forced to abandon the contraband based on an illegal seizure?
>
> B.    Did the Commonwealth fail to prove that the crack cocaine was possessed with the intent to distribute, as the Commonwealth relied on a single conclusory sentence from an expert?

Brief for Appellant at 4.

We begin our consideration of Appellant's first issue with our well-settled standard of review:

Our standard of review in addressing a challenge to a trial court's denial of a suppression motion is limited to determining whether the factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct.

[W]e may consider only the evidence of the prosecution and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the record supports the findings of the suppression court, we are bound by those facts and may reverse only if the court erred in reaching its legal conclusions based upon the facts. **Commonwealth v. Williams**, 2008 PA Super 6, 941 A.2d 14, 26–27 (Pa. Super. 2008) (*en banc* ) (citations, quotations, and quotation marks omitted). Moreover, it is within the lower court's province to pass on the credibility of witnesses and determine the weight to be given to their testimony. **See Commonwealth v. Clemens**, 2013 PA Super 85, 66 A.3d 373, 378 (Pa. Super. 2013). **Commonwealth v. Roberts**, 133 A.3d 759, 771 (Pa. Super. 2016), *appeal denied*, 145 A.3d 725 (Pa. 2016). Furthermore, our Supreme Court in **In the Interest of L.J.**, 622 Pa. 126, 79 A.3d 1073, 1085 (2013), clarified that the scope of review of orders granting or denying motions to suppress is limited to the evidence presented at the suppression hearing.

**Commonwealth v. McCoy**, 154 A.3d 813, 815–16 (Pa.Super. 2017).

Appellant initially contends the suppression court erred in denying his motion to suppress the firearm and crack cocaine secreted under the black SUV because officers had neither reasonable suspicion nor probable cause to stop him and he was forced to abandon the contraband as a result of the illegal stop. Specifically, Appellant maintains:

Officer McChord commanded Appellant to stop and submit to an investigative detention. But he did so based on an anonymous and uncorroborated tip. The claimed girlfriend of the victim told Detective Rocks that the shooter was at a particular location and was wearing particular clothes. But Appellant was stopped at another location and there is no proof offered that he was wearing the same-or even similar-clothing. Indeed, the

- 6 -

record does not indicate whether Appellant matched the initial description offered of a short, black male.  Perhaps the only certainty is that Appellant does not have a "Ju Ju" tattoo, as Detective Rocks claimed.  (N.T. 4/11/16, pp. 30-31).  Given the fact that the caller was never conclusively identified and that the Commonwealth failed to prove that Appellant matched the descriptive information given, Officer McCord did not have authority to stop Appellant.

"A criminal defendant has no standing to contest the search and seizure of items he has voluntarily abandoned." Commonwealth v. Welch, 120 A.3d 1047 (Pa.Super. 2015).  But Pennsylvania law recognizes the concept of "forced abandonment" [] which holds that "when contraband is discarded by a person fleeing from a police officer who possesses neither probable cause to arrest nor reasonable suspicion to conduct a *Terry* [1] stop, the contraband is the fruit of an illegal seizure." Id.

Though Appellant discarded the contraband as he fled, he was forced to do so by Officer McChord's illegal seizure.  Thus, the evidence should have been suppressed and the lower court's failure to do so was an abuse of discretion. As such, Appellant respectfully requests this Court to vacate his judgments of sentence and remand to the lower court with instruction to prohibit the Commonwealth from presenting the contraband in its case against Appellant.

_____

Terry v. Ohio, 392 U.S. 1 (1968).

Brief for Appellant at 12-13.

Our disposition of this claim depends upon the nature of Appellant's encounter with police.  In **McCoy**, this Court recently reiterated the three types of encounters between law enforcement officials and private citizens:

A "mere encounter" need not be supported by any level of suspicion but carries no official compulsion to stop or respond. An "investigative detention" must be supported by reasonable suspicion and subjects the suspect to a stop and a period of detention, but it does not have the coercive conditions that would constitute an arrest. The courts determine whether reasonable suspicion exists by examining the totality of the

circumstances. An arrest, or "custodial detention," must be supported by probable cause.

**McCoy**, 154 A.3d at 816 (citing **In re J.G.**, 145 A.3d 1179, 1185 (Pa.Super. 2016)).

> "To have reasonable suspicion, police officers need not personally observe the illegal or suspicious conduct, but may rely upon the information of third parties, including tips from citizens." **Commonwealth v. Swartz**, 787 A.2d 1021, 1024 (Pa.Super. 2001) *(en banc)* (citation omitted). "Indeed, identified citizens who report their observations of criminal activity to police are assumed to be trustworthy, in the absence of special circumstances, since a known informant places himself at risk of prosecution for filing a false claim if the tip is untrue, whereas an unknown informant faces no such risk." **Commonwealth v. Barber**, 889 A.2d 587, 593 (Pa.Super. 2005). Similarly, "Pennsylvania law ... permits a vehicle stop based upon a radio bulletin if evidence is offered at the suppression hearing to establish reasonable suspicion." **Id**. at 594.
>
>> [F]or a stop to be valid, someone in the police department must possess sufficient information to give rise to reasonable suspicion. The officer with the reasonable suspicion, usually the dispatcher, need not convey all of this background information to the officer who actually effectuates the stop. Thus, the police may justify the search by presenting sufficient evidence at the suppression hearing that someone in the chain of command had reasonable suspicion before the stop, even if the arresting officer did not.
>
> **Id**. (citation omitted).

**Commonwealth v. Anthony**, 977 A.2d 1182, 1187 (Pa.Super. 2009).

In light of the foregoing and following our review, we find the record belies the facts as set forth by Appellant and disagree with his claim that officers lacked reasonable suspicion to detain him initially. Accordingly, we

- 8 -

reject Appellant's argument that he abandoned the contraband only after he had been seized absent reasonable suspicion or probable cause.

At the suppression hearing, Detective Michael Rocks testified that during the course of his investigation of a shooting which had taken place on December 12, 2014, in the 2500 block of North 30th Street, he developed Appellant as a suspect after receiving information from Officer Calabrese obtained from the victim concerning the nickname of the alleged shooter.[1] N.T., 4/11/16, at 6-8. The victim had indicated to Officer Calabrese that he could not believe "Ju Ju" had shot him and that the shooter was a short, black male. *Id*. at 8-9. Based upon the nickname and description the victim provided along with information regarding the area in which the shooting had occurred, Detective Rocks suspected Appellant was the perpetrator, although no arrest warrant was issued. *Id*. at 9, 17-18. Appellant's claims to the contrary, Detective Rocks did not unequivocally state that Appellant had a tattoo of "Ju Ju" but rather said that "if his memory serv[ed] him correctly, [he] believe[d] [Appellant] has that tattooed on him somewhere also, Ju Ju." *Id*. at 18.

The record also belies Appellant's assertion that officers relied on an uncorroborated, anonymous tip in effecting the stop. On December 23, 2014, a female who identified herself by name and as the victim's girlfriend

---

[1] Officer Calabrese's first name does not appear in the record.

informed Detective Rocks the man who had shot her boyfriend was standing in the 2600 block of North 30th Street and was wearing a gray jacket and jeans. Detective Rocks then supplied that information to Officer McChord and informed him the suspected shooter's name was Julius Brockman. *Id*. at 10-11, 13. Detective Rocks directed Officers McChord and D'Amico "to stop [Appellant] and bring him to Central Detectives for investigation" were they to see him. *Id*. at 10, 12.[2] Although he never had interviewed the victim's girlfriend in person, Detective Rocks had had contact with her "several times" between December 12th, the day of the shooting, and December 23, when she provided the aforementioned information to him. *Id*. at 13-14. In fact, she obtained the Detective's contact information from the professional card which he had left at the hospital with the victim. *Id*. at 14.

Officer McChord stated he knew Appellant from previously "seeing him in the neighborhood" and was aware Officer D'Amico, his partner, had arrested Appellant earlier that year. *Id*. at 22. When Officer McChord saw Appellant on December 23, 2014, and told him to stop, he did not intend to arrest him. Officer McChord did not draw his weapon or activate the lights and sirens of the patrol vehicle. *Id*. at 23-24. In response to Officer McChord's words, Appellant immediately placed his right hand into the front

_____

[2] Officer D'Amico's first name does not appear in the record.

- 10 -

side of his waistband and fled on foot. At that point, Officer McChord saw him pull out a black handgun and a clear bag and drop the items underneath "the front part" of a parked, black SUV. *Id*. at 24.

After articulating its factual findings, the suppression court denied Appellant's suppression motion and stated its reasons for doing so as follows:

> My conclusions of law are that in order for there to be reasonable suspicion to stop [Appellant], the Commonwealth needs to establish that there was some basis for a belief that [Appellant] did, in fact, match a description for the suspect in that shooting.
>
> The basis for that belief was the information, verbal information, that was relayed from the shooting victim to Officer Calabrese and Officer Calabrese then relating the nickname Ju Ju and the sketch, the very brief description of the height and racial color, as well as location.
>
> Detective Rocks established, through whatever means he established, that he believed that [Appellant] did fit this description. However, there was no arrest warrant issued. Detective Rocks did not do anything with that information it seems until he then gets the call from the woman who identifies herself as [Appellant's], rather as the victim's girlfriend. And Detective Rocks was familiar with this woman having already spoken to her. So she is not merely an anonymous tip at this point, and she gives him information that the person who he's developed as a suspect is, indeed, at a specific location.
>
> For Detective Rocks to have simply ignored that information and not acted on it would have been a dereliction of his duty to investigate his suspect. I don't think that the police are required under Taggart[3] or under any other case law to turn a blind eye toward good information that they receive, and this was good information. It was not a flash anonymous tip situation, as it is in Taggart. This is called police investigation, and good police investigation. So, certainly, Detective Rocks

---

[3] The suppression court did not supply a full citation for **Taggart**.

acted appropriately by having the officers in the 22nd see if they could locate the fellow that was described as [Appellant].

And Officer McChord, therefore, is doing just that. Had he had five police cars drive up on [Appellant], block [Appellant] and at point of gun, you know, that would have been a different situation. That is not the situation here. He told [Appellant] to stop. [Appellant] made the choice then to flee, clutching his waistband.

And, certainly, Officer McChord, at that point, had good reason to chase [Appellant] at the point where [Appellant] discarded his gun and baggie. He did so based upon flight from the police. Certainly, at that point, they had reasonable suspicion that a crime was being committed, quite frankly, in their presence. So for all of those reasons, the motion is denied.

N.T., 4/11/16, at 40-43.

The facts of record support the suppression court's determination that officers initially had reasonable suspicion to stop Appellant. Accordingly, Appellant is not entitled to suppression of the contraband he discarded during his flight. **See Mccoy**, **supra**, at 819 (citing **Commonwealth v. Cook**, 558 Pa. 50, 735 A.2d 673, 675 (1999) (finding where police officers demonstrate reasonable suspicion to stop suspect, officers may lawfully recover contraband suspect abandoned during flight)).

Appellant next maintains the Commonwealth failed to present sufficient evidence for the trial court to conclude that he possessed crack cocaine with the intent to deliver because "[t]he Commonwealth's sole evidence at trial was that Appellant possessed 35 packets of crack cocaine and that an 'expert' concluded that, 'in his expert opinion, the [crack cocaine] was possessed with the intent to deliver'" Brief for Appellant at 15 (citing N.T., 4/11/16, at 51). Appellant opines that a "single conclusion

cannot substitute for the surrounding circumstances and how those circumstances would lead a proper expert could [sic] use those circumstances to reach a conclusion that the drugs were possessed with an intent to deliver." *Id*.

When considering this claim which presents us with a question of law, we are guided by a well-established standard of review:

> The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the finder of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.
>
> This standard is equally applicable to cases where the evidence is circumstantial rather than direct so long as the combination of the evidence links the accused to the crime beyond a reasonable doubt. Although a conviction must be based on more than mere suspicion or conjecture, the Commonwealth need not establish guilt to a mathematical certainty.

*Commonwealth v. Antidormi*, 84 A.3d 736, 756 (Pa.Super. 2014) (quotations and citations omitted).

To sustain a conviction for Possession with Intent to Deliver, "the Commonwealth must prove both the possession of the controlled substance and the intent to deliver the controlled substance." ***Commonwealth v. Lee***, 956 A.2d 1024, 1028 (Pa.Super. 2008) (citations omitted). "In narcotics possession cases, the Commonwealth may meet its burden by showing actual, constructive, or joint constructive possession of the contraband." ***Commonwealth v. Vargas***, 108 A.3d 858, 868 (Pa.Super. 2014) (*en banc*) (citation and quotation marks omitted).

In the matter *sub judice*, police did not discover the crack cocaine on Appellant's person; however, Appellant does not challenge the element of possession. Rather, he maintains the Commonwealth failed to prove he intended to deliver the crack cocaine. When determining whether an individual in possession of drugs intended to deliver them, the starting point is the quantity possessed.

> In Pennsylvania, the intent to deliver may be inferred from possession of a large quantity of controlled substance. It follows that possession of a small amount of a controlled substance supports the conclusion that there is an absence of intent to deliver. Notably, if, when considering only the quantity of a controlled substance, it is not clear whether the substance is being used for personal consumption or distribution, it then becomes necessary to analyze other factors.

***Commonwealth v. Lee***, 956 A.2d 1024, 1028 (Pa.Super. 2008) (citation and quotation marks omitted). ***See also Commonwealth v. Ratsamy***, 594 Pa. 176, 182, 934 A.2d 1233, 1237 (2007) (stating "if the quantity of the

controlled substance is not dispositive as to the intent, the court may look to other factors."). The list of additional factors includes:

> the manner in which the controlled substance was packaged, the behavior of the defendant, the presence of drug paraphernalia, and [the] sums of cash found in possession of the defendant. The final factor to be considered is expert testimony. Expert opinion testimony is admissible concerning whether the facts surrounding the possession of controlled substances are consistent with an intent to deliver rather than with an intent to possess it for personal use.

*Id*. at 183, 934 A.2d at 1237–38 (quotation and internal quotation marks omitted).

Contrary to Appellant's assertions, the evidence presented herein was not limited to a "single conclusion" of an expert that Appellant possessed the crack cocaine with the intent to deliver. Rather, the evidence also showed that Appellant possessed the drugs, as officers observed him discard the same under the SUV, that Appellant abandoned the contraband while fleeing police, and that the crack cocaine was packaged in separate quantities comprised of almost three dozen packets. Specifically, Appellant stipulated that Officer McChord would testify at trial that when he recovered the clear bag Appellant discarded, he discovered it contained thirty-five "clear plastic Ziploc packets" of crack cocaine each of which was marked with a black and yellow "Batman symbol." N.T., 4/11/16, at 50. Appellant also stipulated

that Officer Keys,[4] the Commonwealth's expert, would testify the total weight of the contraband was 3.943 grams and opine beyond a reasonable doubt that following his review of the file and his listening to the testimony, Appellant possessed the crack cocaine with the intent to deliver. *Id*. at 51-52.

Furthermore, we note the record does not reveal that Appellant possessed any personal-use paraphernalia, a circumstance this Court has deemed relevant. *See **Commonwealth v. Bess***, 789 A.2d 757, 762 (Pa.Super. 2002) (finding that in addition to other factors, the fact defendant did not have any drug paraphernalia associated with the personal use of cocaine was relevant to establish he possessed drugs with the intent to deliver). As such, we find the presence of the aforementioned factors along with Officer Keys' expert opinion provided a sufficient basis for the verdict of the trial court, sitting as the finder of fact. Therefore, taken together, we do not find that the evidence was "so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances." ***Ratsamy***, at 181 n. 2, 934 A.2d at 1236 n. 2. Therefore, no relief is due.

Judgment of Sentence Affirmed.

Judge Dubow joins the Opinion.

---

[4] Officer Keys' first name does not appear in the record.

Judge Ott concurs in the result.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 7/5/2017