J-S40035-24

2025 PA Super 47

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| DOUGLAS JAMES | : | No. 2812 EDA 2023 |

Appeal from the Order Entered September 18, 2023
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0007352-2022

BEFORE: STABILE, J., McLAUGHLIN, J., and LANE, J.

OPINION BY LANE, J.: **FILED FEBRUARY 26, 2025**

The Commonwealth appeals from the order granting the suppression motion of Douglas James ("James"). Upon the facts presented in this appeal, we hold: (1) when a police officer possessed the requisite reasonable suspicion to submit James to an investigative detention, the officer's attempt to grab James, and his subsequent chase of James, did not elevate the investigative detention to the functional equivalent of a seizure requiring probable cause; and (2) the doctrine of forced abandonment did not apply to a satchel discarded by James during this chase. Accordingly, we reverse.

In September 2022, Philadelphia Police Officer Michael Duffy ("Officer Duffy") and his partner were on marked police bicycles patrolling the area of 500 Ritner Street, Philadelphia, when they responded to a person "screaming" in nearby Mifflin Square Park. N.T., 9/18/23, at 8. A Spanish-speaking woman "flagged [them] down," became "excited," and pointed to four men, including James, who were exiting the park. *Id*. at 8-10. With her daughter

interpreting, the woman stated they "just assaulted" her son. *Id*. at 10. The woman's son was not on the scene. Officer Duffy mounted his bicycle and rode in the direction of the four men.

Officer Duffy observed three of the men run away from the park, but James remained walking. When Officer Duffy pulled up to James, James "bladed his body [*sic*]" away from the officer. *Id*. at 10-11. James was wearing all black clothing and had a black Nike satchel around his shoulder.

Officer Duffy instructed James to stop several times, but James did not stop. The officer reached out to "grab" James, but was unsuccessful. N.T., 9/18/23, at 27. James ran away from the officer. Officer Duffy pursued James on his bicycle, but did not turn on the bicycle's lights or siren. Officer Duffy did not draw his weapon prior to or during this chase.

After a pursuit spanning approximately thirty seconds, Officer Duffy stopped James.[1] James no longer had the black Nike satchel. Backup responding officers secured James while Officer Duffy searched for the satchel. Officer Duffy found it in a blue recycling bin. Officer Duffy believed the satchel contained a firearm due to its weight and his experience, explaining "[i]t's a newer way that individuals are carrying firearms in . . . satchels." N.T., 9/18/23, at 17. Inside the satchel, the officer recovered a nine-millimeter silver Taurus firearm with seven live rounds, three bags of marijuana, a debit card in James' name, and $50 cash. The Commonwealth charged James with

_____

[1] Officer Duffy did not explain how he came to stop James.

firearms not to be carried without a license and carrying a firearm in public in Philadelphia.[2]

James filed a motion to suppress the evidence of the satchel and its contents based on a theory of forced abandonment. The trial court held a hearing, where Officer Duffy testified to the above events, and the Commonwealth played a video recording captured by Officer Duffy's body camera.

At the conclusion of the hearing, the trial court found Officer Duffy initially conducted an investigative detention, and he possessed the requisite reasonable suspicion to do so. The court reasoned "[t]here clearly was enough information for the officer to investigate" the alleged assault. N.T., 9/18/23, at 45. However, the court found his attempt to grab James was "coercive" and "cross[ed] the line" into a detainment. *Id*. at 45-46. The trial court then determined Officer Duffy did not have probable cause to attempt to grab, nor subsequently chase, James. Thus, it concluded the doctrine of forced abandonment applied, and granted suppression. The Commonwealth filed a timely notice of appeal in compliance with Pa.R.A.P. 311(d),[3] and both it and the trial court complied with Pa.R.A.P. 1925.

_____

[2] *See* 18 Pa.C.S.A. §§ 6106(a)(1), 6108.

[3] *See* Pa.R.A.P. 311(d) (providing that in a criminal case, "the Commonwealth may take an appeal as of right from an order that does not end the entire case where the Commonwealth certifies in the notice of appeal that the order will terminate or substantially handicap the prosecution").

The Commonwealth raises the following issue for our review: "Did the [trial] court erroneously suppress the firearm that [James] abandoned while being pursued during a lawful investigative detention that was supported by reasonable suspicion?" Commonwealth's Brief at 4.

We first consider the applicable standard of review:

> When reviewing an order granting a defendant's motion to suppress evidence, we are bound by that court's factual findings to the extent that they are supported by the record, and we consider only the evidence offered by the defendant, as well as any portion of the Commonwealth's evidence which remains uncontradicted, when read in the context of the entire record. Our review of the legal conclusions which have been drawn from such evidence, however, is *de novo*, and, consequently, we are not bound by the legal conclusions of the lower courts. Moreover, our scope of review from a suppression ruling is limited to the evidentiary record that was created at the suppression hearing.

*Commonwealth v. Barnes*, 296 A.3d 52, 55 (Pa. Super. 2023) (citations and quotation marks omitted).

The Fourth Amendment to the United States Constitution and Article I, Section 8 of the Pennsylvania Constitution protect citizens from unreasonable searches and seizures. *See id*. However, "[n]ot every encounter between a law enforcement officer and a citizen constitutes a seizure warranting constitutional protections." *Commonwealth v. Adams*, 205 A.3d 1195, 1199 (Pa. 2019). As our Supreme Court has explained:

> We have long recognized three types of interactions that occur between law enforcement and private citizens. The first is a mere encounter, sometimes referred to as a consensual encounter, which does not require the officer to have any suspicion that the citizen is or has been engaged in criminal

- 4 -

activity. This interaction also does not compel the citizen to stop or respond to the officer. A mere encounter does not constitute a seizure, as the citizen is free to choose whether to engage with the officer and comply with any requests made or, conversely, to ignore the officer and continue on his or her way.

The second type of interaction, an investigative detention, is a temporary detention of a citizen. This interaction constitutes a seizure of a person, and to be constitutionally valid police must have a reasonable suspicion that criminal activity is afoot.

The third, a custodial detention, is the functional equivalent of an arrest and must be supported by probable cause. A custodial detention also constitutes a seizure.

No bright lines separate these types of encounters[.]

*Id*. at 1199-1200 (citations, quotation marks, and some punctuation omitted, and paragraph breaks added).

This Court has stated:

An investigative detention may develop into a custodial detention. The key difference between an investigative and a custodial detention is that the latter involves such coercive conditions as to constitute the functional equivalent of an arrest. The court considers the totality of the circumstances to determine if an encounter is investigatory or custodial.

The numerous factors used to determine whether a detention has evolved into an arrest include the cause for the detention, the detention's length, the detention's location, whether the suspect was transported against his or her will, whether the police used or threatened force, and the character of the investigative methods used to confirm or dispel the suspicions of police. . . .

*Commonwealth v. Spence*, 290 A.3d 301, 314-15 (Pa. Super. 2023) (citations and quotation marks omitted).

Relevantly, this Court has considered the distinction between an investigative detention and a custodial detention. In **Commonwealth v. Valentin**, 748 A.2d 711 (Pa. Super. 2000), a uniformed police officer on patrol conducted surveillance in a location notorious for open drug sales. **See id**. at 712. The officer observed a man handing money to Valentin, and Valentin handing small objects to the man. **See id**. The officer believed this was a narcotics transaction and detained Valentin. **See id**. In doing so, the officer held Valentin by his clothing and directed him to place his hands on a nearby car. **See id**. at 714. Valentin told the officer he had "two bags of dope" in his pocket. **Id**. at 712. The officer's partner removed packets of heroin from Valentin's pocket and placed him under arrest. **See id**. Valentin moved to suppress the physical evidence as well as the statements he made while detained. **See id**. The trial court denied suppression, concluding the officers "had reasonable suspicion to conduct an investigatory stop and that the drugs were removed from Valentin's person without illegal police conduct." **Id**.

On appeal, Valentin argued that the trial court erred by denying suppression, as the detaining officers had neither the reasonable suspicion nor probable cause to detain and search him. **See id**. at 713. After review, our Court affirmed, determining that the officer's holding Valentin's clothing and directing him to place his hands on a nearby car did not render the detention the functional equivalent of an arrest. **See id**. at 714. Pertinently, the officers: "detained Valentin briefly on a public street[;] refrained from

- 6 -

interrogation[; and] did not display their weapons, make any threats in detaining Valentin, or transport Valentin against his will." *Id*. Thus, this Court concluded "that Valentin's seizure was more analogous to an investigatory detention [requiring reasonable suspicion] than to a formal arrest" requiring probable cause. *Id*.

In *Commonwealth v. Coleman*, 19 A.3d 1111 (Pa. Super. 2011), a police officer responded to a robbery in progress conducted at "point of gun and point of knife." *Id*. at 1114. The radio call described the suspects as two Black men "wearing green hooded jackets with black coats over them." *Id*. The officer observed Coleman matching this description, approached him, and asked him if he had a gun. *See id*. Coleman "responded 'no,' but at the same time fumbled with his hands in his pocket." *Id*. Although the officer asked Coleman to raise his hands, Coleman kept his hands in his pockets. *See id*. The officer thereafter brought Coleman to his police van while Coleman resisted and continued "to wrestle with his hands in his pockets." *Id*. As the officer attempted to pull Coleman's hands out of his pockets and place them against the police van, a struggle ensued, during which Coleman struck the officer's chest with his shoulders while repeatedly telling the officer "to get off of him." *Id*. at 1118. After the struggle ended, the officer patted Coleman down and felt a hard object in his pocket, which Coleman told the officer were knives. *See id*. at 1114. The officer then recovered two knives from Coleman's person. *See id*.

Coleman filed a motion to suppress the knives as evidence, but the trial court denied this motion. *See Coleman*, 19 A.3d at 1114. On appeal, Coleman argued that the trial court erred in denying suppression because the officer initiated an investigative detention without the requisite reasonable suspicion. *See id*. at 1115. This Court disagreed, determining that the "combination of the description of the robber along with [Coleman's] refusal to remove his hand from his pocket and his 'fumbling' in that pocket was sufficient to justify an investigative detention and protective frisk of [Coleman]." *Id*. at 1117. Thus, this Court agreed that the officer's grabbing Coleman's arm and transporting him to a police van against his will was an investigative detention, and concluded the officer possessed the requisite reasonable suspicion. *See id*.

Finally, in *Commonwealth v. Shivers*, 305 A.3d 970 (Pa. Super. 2023) (unpublished memorandum),[4] two police officers were on routine patrol in uniform and in an unmarked patrol car, when they went to a gas station. *See id*. at *2. Upon arriving in the parking lot, the officers saw Shivers at the front of the store, next to several men, two of whom the officers recognized as gang members. *See id*. Once the officers exited their patrol car, Shivers "started 'backing away;'" as the officers approached the store, Shivers ran

---

[4] *See* Pa.R.A.P. 126(b)(1)-(2) (stating that a non-precedential decision filed by the Superior Court after May 1, 2019, may be cited for its persuasive value).

from the store with his hands in front of him, "in a manner consistent with . . . 'holding onto a firearm or holding their pants up.'" *Id*. The officers chased Shivers on foot and attempted to grab him, but he broke free from the officer's grasp. *See id*. at *8. One officer then tackled Shivers to the ground. *See id*. While Shivers was on the ground, one of the officers observed the outline of a firearm in his pants pocket; the officer reached in the pocket and recovered a .32 caliber handgun. *See id*. at *2.

The trial court denied Shivers' motion to suppress the handgun, reasoning that his "unprovoked flight in a high crime area gave the officers reasonable suspicion to pursue and stop him." *Shivers*, 305 A.3d 970 (unpublished memorandum at *2). On appeal, Shivers argued that the court erred in denying his suppression motion. *See id*. at *3. Specifically, he averred that the police officer's tackling him amounted to an arrest requiring probable cause. *See id*. at *7. Our Court disagreed, determining that the officer's act of tackling Shivers was merely an investigative detention. *See id*. at *8. Pertinently, "Shivers'[] active resistance compelled stronger restraint to allow the police to conduct the investigative detention[,]" which was supported by adequate reasonable suspicion. *Id*.

Returning to the instant appeal, the Commonwealth challenges: (1) the trial court's finding that Officer Duffy's attempt to grab James elevated the encounter to a seizure requiring a showing of probable cause; and (2) its

application of the doctrine of forced abandonment to suppress James' satchel. For ease of review, we address these issues separately.

We first review the Commonwealth's argument that the trial court erred when it determined Officer Duffy's attempt to grab James constituted a seizure requiring probable cause. While the Commonwealth agrees the trial court properly found Officer Duffy had reasonable suspicion to conduct an investigative stop, it argues that the court erred in finding Officer Duffy's attempt to grab James elevated the encounter to a seizure requiring a showing of probable cause. Instead, the Commonwealth maintains that Officer Duffy's approaching James, telling him to "stop," and attempting to grab him were all part of the initiation of a lawful investigative detention.

In response, James contends "Officer Duffy lacked reasonable suspicion to engage [him, and] this was a mere encounter." James' Brief at 4 (quotation marks omitted). Specifically, he argues that "Officer Duffy's gathered first-hand information, combined with his complete lack of follow-up [of the alleged assault] made clear he had no 'reasonable suspicion' that an assault had been committed nor 'reasonable suspicion' that [James] was identified as a suspect." *Id*. at 5.

In granting suppression, the trial court reasoned:

> In the instant case, while the court agrees that Officer Duffy had enough reasonable suspicion to investigate [James] and the other males, . . . the officer did not have probable cause to chase or apprehend [James].

- 10 -

Officer Duffy testified that . . . he encountered a distressed [woman who] pointed in the direction of four persons, [including James], and expressed her concern about a possible assault. While there was no specific inquiry nor any details about what the incident was, Officer Duffy had enough probable cause [*sic*] to approach the males to at least investigate further.

\* \* \* \*

While Officer Duffy had the right to pursue an investigation, he did not have probable cause to chase down [James] since the woman [in the park] specifically did not identify him as the perpetrator of the assault. In fact, she did not give any description of the alleged attacker or attackers.

Per Officer Duffy's body worn camera videotape, the officer was seen in the video reaching out to grab [James] prior to [James] running away from the encounter. Moreover, there was no evidence presented that [James] was involved in any criminal behavior that evening before encountering the officer.

Based on the totality of the circumstances, Officer Duffy unlawfully escalated reasonable suspicion [*sic*] by attempting to seize [James] during their encounter. Further, even though proper investigatory grounds were present, Officer Duffy chose to chase [James], who presumably felt forced to discard his satchel and other personal items.

Trial Court Opinion, 2/21/24, at 4-5 (unnecessary capitalization omitted).

We note that during the suppression hearing, the trial court further reasoned that "[h]ad the officer not said stop or tried to grab [James,] and [James] ran from the encounter," then the officer would have "had more than enough reasonable suspicion[,] and at that point probable cause to pursue[.]" N.T., 9/18/23, at 46.

After reviewing the evidence presented at the suppression hearing, the totality of the circumstances, and the relevant law, we conclude the trial court

erred in determining that Officer Duffy's attempt to grab James escalated the investigative detention to a seizure requiring a finding of probable cause. We reiterate that an **investigative** detention is a detention and seizure of a person, albeit temporary and less coercive than a **custodial** detention. **See Adams**, 205 A.3d at 1200.

Applying **Valentin** and **Coleman** to the instant case, we determine that Officer Duffy's failed attempt to grab James did not escalate the encounter into a seizure requiring probable cause; pertinently, **even if** Officer Duffy successfully grabbed James during this initial detention, both **Valentin** and **Coleman** instruct that such an act would remain an investigative detention. By applying **Shivers**, we determine that Officer Duffy's brief pursuit of James similarly did not escalate the seizure into one requiring probable cause, as the officer's reasonable suspicion permitted him to both chase, **and tackle**, James under the circumstances presented. We observe that Officer Duffy's actions were more restrained than those of the officers in each of these three cases. Accordingly, we conclude these actions were commensurate with that of an investigative detention. Thus, although we do not disturb the trial court's finding that Officer Duffy had the requisite reasonable suspicion to initiate an investigative detention, we hold the court erred by finding that the officer's actions escalated the detention into a seizure requiring probable cause.

We next review the Commonwealth's argument concerning forced abandonment. Generally,

[a] criminal defendant has no standing to contest the search and seizure of items he has voluntarily abandoned. But Pennsylvania law recognizes the concept of "forced abandonment" which holds that when contraband is discarded by a person fleeing from a police officer who possesses ***neither probable cause to arrest nor reasonable suspicion to conduct [an investigative detention]***, the contraband is the fruit of an illegal seizure.

***Commonwealth v. Brockman***, 167 A.3d 29, 35 (Pa. Super. 2018) (citations, some quotation marks, and punctuation omitted, and emphasis added).

The Commonwealth argues that the trial court erred in applying the doctrine of forced abandonment to the satchel. ***See*** Commonwealth's Brief at 12. Specifically, the Commonwealth avers that because the trial court found Officer Duffy possessed the requisite reasonable suspicion to submit James to an investigative detention, Officer Duffy's pursuit of James was lawful "[u]p to and including the moment [James] discarded the satchel." ***Id***. Thus, the Commonwealth contends James voluntarily abandoned his satchel during the encounter, and the trial court's "suppression order was erroneous." ***Id***.

As stated previously, the trial court found that while Officer Duffy possessed reasonable suspicion to submit James to an investigative detention, the officer unlawfully escalated the encounter to a detainment while lacking the requisite probable cause to do so. ***See*** Trial Court Opinion, 2/21/24, at 4-5. On this basis, the trial court concluded that James "felt forced to discard his satchel," and thus the court suppressed the satchel and its contents. ***Id***. at 5.

However, because we conclude the encounter remained a lawful investigative detention, for which Officer Duffy possessed reasonable suspicion, we hold suppression under the theory of forced abandonment was improper. *See Brockman*, 167 A.3d at 35 (stating that under the theory of forced abandonment, discarded contraband is fruit of an illegal seizure when "a person flee[s] from a police officer who possesses *neither* probable cause to arrest *nor* reasonable suspicion to conduct" an investigative detention) (emphases added). Thus, we reverse the trial court's order granting James' motion to suppress.

Order reversed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 2/26/2025