J-S21036-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA　　:　IN THE SUPERIOR COURT OF
　　　　　　　　　　　　　　　　　　:　　　　PENNSYLVANIA
　　　　　　　　　　　　　　　　　　:
　　　　　　　v.　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　:
SHAYNE D. SWEET　　　　　　　　　:
　　　　　　　　　　　　　　　　　　:
　　　　　　Appellant　　　　　　　:　No. 2080 EDA 2023

Appeal from the Judgment of Sentence Entered January 6, 2022
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0003424-2019


BEFORE:　LAZARUS, P.J., NICHOLS, J., and MURRAY, J.

MEMORANDUM BY MURRAY, J.:　　　　　　　　**FILED AUGUST 6, 2024**

Shayne D. Sweet (Appellant) appeals, *nunc pro tunc*,[1] from the judgment of sentence entered following his convictions by a jury of second-degree murder, robbery, possession of an instrument of crime (PIC), and criminal conspiracy.[2]　After careful consideration, we affirm.

The trial court summarized the underlying facts relevant to this appeal:

> Around 7 p.m. on December 3, 2017, Mike Massaro [(Massaro)] left his brother's house after watching football all afternoon.　He texted Savannah Pharo [(Pharo)], whom he had met while she was working as a dancer at a strip club, to see if she would meet up with him in exchange for $600.　Massaro had previously met up with Pharo on approximately ten occasions in exchange for money.　Massaro picked Pharo up at around 9:30

---

[1] Appellant successfully sought reinstatement of his direct appeal rights by means of a timely filed Post Conviction Relief Act (PCRA) petition.　***See*** 42 Pa.C.S.A. §§ 9541-9546.

[2] ***See*** 18 Pa.C.S.A. §§ 2502(b), 3701(a)(1)(i), 907(a), 903.

p.m. from the house Pharo lived in with [Appellant]. Massaro and Pharo drove to South Philadelphia, where they picked up food and went to see a Christmas light[s] display[,] before going to Massaro's house. Once at Massaro's house, Pharo and Massaro ate their food and watched a movie in Massaro's bedroom.

At some point during the movie, Massaro offered to drive Pharo home after he grew frustrated with Pharo's continual text messaging and the fact that she would not stay overnight, after she had told Massaro she would. Pharo declined the ride and told Massaro that [Appellant] would pick her up. Unbeknownst to Massaro, Pharo and [Appellant] had planned a scam to trick Massaro into giving Pharo an additional $300. Pharo falsely told Massaro that she needed $300 to pay her rent and showed him a text message that appeared to be from someone named "Alicia" demanding the rent money. The text from "Alicia" was actually created by [Appellant,] using a texting app that permitted the user to text from a different telephone number and use a false name. After seeing the text, Massaro told Pharo he could not give her the additional money because he had already given her all the money he had on him when he picked her up.

Trial Court Opinion, 10/18/23, at 3-4 (citations omitted).

Pharo contacted Appellant and asked him to pick her up from Massaro's home. However,

[Appellant] texted Pharo stating "I'll come down the [*sic*] and rob [Massaro] with my scheme [*sic*] mask and knife." When [Appellant] arrived sometime after 11 p.m., Pharo got into [Appellant's] car and [Appellant] told Pharo that he was going to rob Massaro. [Appellant] then got out of his car and attempted to enter Massaro's house. When he could not enter, [Appellant] returned to the car[,] brandishing a knife and wearing a ski mask[,] and asked Pharo to go back inside. Pharo went back to Massaro's house and told Massaro that she needed to use the bathroom. Pharo went upstairs to the bathroom where she remained for approximately ten minutes.

While in the bathroom, Pharo heard Massaro come upstairs[,] followed a few minutes later by someone else. At that point, Pharo heard Massaro ask[,] "What the fuck are you doing in my house[?]" and then heard [Appellant] say something about

- 2 -

a computer before Massaro yelled[,] "what the fuck did you do that for?" [Appellant] then banged on the bathroom door, told Pharo to get out of the bathroom, and stated that he "fucked up." As Pharo left the bathroom, she turned to the left and saw Massaro's foot at the bottom of the bed in his room and assumed Massaro was hurt. [Appellant] and Pharo left the house and, when they got back into [Appellant's] car, Pharo called 911. At [Appellant's] urging, Pharo ended her first 911 call but then changed her mind and called back.

On their way to [Appellant's] house, [Appellant] pulled over at Penn Treaty Park in order to throw his clothing and knife in the river. However, police pulled up to [Appellant's] car and told [Appellant] and Pharo that they could not be in the park after hours. [Appellant] and Pharo left the park and drove to Delaware Avenue, near the intersection of Richmond Street and Castor Avenue, where [Appellant] asked Pharo to throw his clothing in the sewer. Pharo threw [Appellant's] ski mask, knife, sweater, pants, and sneakers in the sewer.

*Id.* at 4-5 (citations omitted).

At about 1:00 a.m., police arrived at Massaro's home. When no one answered the door, officers called Pharo. The trial court described what next transpired:

While on the phone, Pharo told officers that Massaro was still inside. [Philadelphia Police] Officer [Job] Henri went back to Massaro's home and continued to knock on the door. While doing so, Officer Henri noticed the door was unlocked and proceeded to enter the home. Once inside, Officer Henri observed blood spatter in the front room of the house and then saw Massaro lying unresponsive on the floor with a stab wound to his abdomen. Medics arrived shortly thereafter and pronounced Massaro dead at 1:36 a.m. The medical examiner determined that [Appellant's] cause of death was a stab wound to the torso and his manner of death was homicide.

*Id.* at 3-5 (citations omitted). Pharo originally claimed that she held the knife that killed Massaro, but later indicated Appellant had committed the murder.

- 3 -

On January 6, 2022, a jury convicted Appellant of the above-described offenses. That same day, the trial court sentenced Appellant to the mandatory sentence of life in prison without parole (LWOP) for his second-degree murder conviction. The trial court imposed a consecutive sentence of 10-20 years in prison for Appellant's conviction of conspiracy, and a consecutive 2½ to 5 years for his conviction of PIC. Thus, the trial court imposed an aggregate sentence of life in prison plus 12½ to 25 years. Appellant filed a post-sentence motion on January 19, 2022. On January 24, 2022, the trial court denied the motion as untimely filed.

As previously mentioned, the PCRA court reinstated Appellant's direct appeal rights *nunc pro tunc*. Thereafter, Appellant timely filed this appeal. Appellant and the trial court have complied with Pa.R.A.P. 1925.

Appellant presents the following issues for review:

1. Whether the evidence was sufficient to sustain the verdicts for robbery, conspiracy to commit robbery[,] and by extension[,] second[-]degree murder[,] as the Commonwealth failed to prove that a theft either occurred or was actually attempted at the time the victim was killed?

2. Whether the verdict was against the weight of the evidence with respect to the question of whether Appellant played any role in the murder of the victim?

3. Whether the court's ruling that data received from the cell service providers did not constitute "statements" within the meaning of the rule against hearsay was supported by record evidence insofar as no testimony was offered to establish how the data was stored, preserved, retrieved, prepared or transmitted to law enforcement?

4. Whether the court erred in concluding that the Commonwealth proved that the text messages admitted during trial were property authenticated within the meaning of [Pa.R.E.] 901-903?

5. Whether it was error for the court to allow the Commonwealth to offer a surreptitiously recorded conversation during which [Appellant] was a participant in violation of Title 18, Chapter 57 of the Pennsylvania Consolidated Statutes (Wiretapping and Electronic Surveillance) or, in the alternative, whether counsel was ineffective in failing to move for exclusion of the same?

Appellant's Brief at 9-10 (capitalization modified).

Appellant first challenges the sufficiency of the evidence underlying his conviction of second-degree murder, because[,] "[q]uite simply, evidence of a theft or attempted theft was lacking." *Id.* at 15. Appellant claims that Pharo's testimony failed to establish that "the killing occurred during the course of the robbery." *Id.* at 17 (emphasis omitted). Appellant argues her testimony demonstrated only that Pharo "heard voices," and did not hear a robbery. *Id.* at 18. Thus, Appellant argues the evidence failed to establish the robbery underlying his second-degree murder conviction. *See id.* at 17.

Appellant additionally argues the testimony of forensic pathologist Dr. Linsay Simon, a Commonwealth witness, indicated Massaro could have "walked into the knife and caused the fatal injuries." *Id.* According to Appellant, the evidence "simply did not cross the requisite threshold" in proving that the underlying incident was a robbery. *Id.* at 19.

The standard we apply in reviewing the sufficiency of the evidence is

> whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to

- 5 -

enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding an [Appellant's] guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that[,] as a matter of law[,] no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence.... Finally, the finder of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

**Commonwealth v. Brockman**, 167 A.3d 29, 38 (Pa. Super. 2017) (citation omitted).

Under the Crimes Code, "[a] person is guilty of a robbery if, in the course of committing a theft, he … inflicts serious bodily injury upon another[.]" 18 Pa.C.S.A. § 3701(a)(1)(i). A robbery under this section is a second-degree felony. **Id.** § 3701(b)(1).

This Court has explained the elements of criminal conspiracy as follows:

In **Commonwealth v. Lambert**, 795 A.2d 1010 (Pa. Super. 2002) [(*en banc*)], this Court set forth four factors to consider in deciding if a conspiracy existed. Those factors were: "(1) an association between alleged conspirators; (2) knowledge of the commission of the crime; (3) presence at the scene of the crime; and (4) in some situations, participation in the object of the conspiracy." **Id.** at 1016. A "conspiratorial agreement can be inferred from a variety of circumstances including, but not limited to, the relation between the parties, knowledge of and participation in the crime, and the circumstances and conduct of the parties surrounding the criminal episode." **Commonwealth v. Feliciano**, 67 A.3d 19, 26 (Pa. Super. 2013) (*en banc*). "The conduct of the parties and the circumstances surrounding such conduct may create a web of evidence linking the accused to the alleged conspiracy beyond a reasonable doubt." **Id.** [(citation

- 6 -

omitted)]. A person guilty of robbery as a co-conspirator is necessarily guilty of conspiracy to commit robbery.

*Commonwealth v. Mitchell*, 135 A.3d 1097, 1102-03 (Pa. Super. 2016).

The second-degree murder statute requires proof that a victim died while a defendant "was engaged as a principal or an accomplice in the perpetration of a felony." 18 Pa.C.S.A. § 2502(b). The "perpetration of a felony" includes "[t]he act of the defendant in engaging in … attempting to commit robbery … by force or threat of force." *Id.* at 2502(d). Section 2502 does not specifically cite to the offense of robbery as codified in 18 Pa.C.S.A. § 3701(a)(1)(i). However, we have recognized, "the General Assembly's intent is best expressed through the plain language of the statute." *Commonwealth v. Gamby*, 283 A.3d 298, 306 (Pa. 2022) (citation omitted). The plain language of section 2502(d) indicates that the legislature used the term "robbery" broadly to include any kind of felony-graded robbery as the predicate offense to second-degree murder. *See Commonwealth v. Lehman*, 311 A.3d 1034, 1044 (Pa. 2024) ("Generally, the plain language of the statute provides the best indication of legislative intent." (citation and internal quotation marks omitted)).

We further observe that the statute defining second-degree murder does not include an element requiring proof that the defendant **committed** the predicate felony. *See* 18 Pa.C.S.A. § 2502(b), (d). Our Supreme Court has confirmed this interpretation by holding that

all the felony murder statute requires is for the jury to conclude that a criminal homicide was committed while the defendant **participated in** a completed or **an attempted** predicate offense.

*Commonwealth v. Miller*, 35 A.3d 1206, 1212 (Pa. 2012) (emphasis added). The Commonwealth "is not required to prove that the accused actually committed the predicate offense." *Id.*

The trial evidence, viewed in a light most favorable to the Commonwealth, established the following. Pharo testified that on December 3, 2017, Massaro paid for Pharo's companionship at his house. N.T., 1/4/22, at 113, 115. Massaro picked Pharo up at around 9:45 p.m., and the two drove around looking at Christmas lights. *Id.* at 117. Eventually, Massaro and Pharo arrived at Massaro's house. *Id.* at 118. The two proceeded upstairs. *Id.* While at Massaro's home, Pharo continuously texted Appellant. *Id.* Pharo testified that Massaro

> got frustrated with me and asked why I was on the phone the whole time. And I'm supposed to sleep over [at Massaro's,] but I didn't tell [Appellant] that, so I told [Massaro] that I couldn't sleep over.
>
> [Massaro] was like, You know, you were supposed to sleep over. And I was like, Well, I can't because of my daughter. So he was like, Okay, I'll drive you home, and I was like, No, it's fine. I'll just get a ride home. … And I texted [Appellant] to pick me up.

*Id.* at 118-19.

Pharo also testified regarding a scheme she and Appellant had used to solicit money from Pharo's companions. *Id.* at 119-20. Using a texting application, Appellant would pretend to be Pharo's landlord, who would

- 8 -

demand immediate payment of the rent. *Id.* at 120-21. However, when Pharo attempted to procure "rent" money from Massaro using this scheme, Massaro declined, as he had no additional funds. *Id.* at 121-22. When the plan failed, Pharo texted Appellant to pick her up from Massaro's house. *Id.* at 122.

At trial, Pharo read and confirmed the text messages from the application and Pharo's text-message exchanges with Appellant. *Id.* at 123-33. In particular, Pharo confirmed Appellant had text messaged her, "Get that money." *Id.* at 132. Pharo further explained that Appellant "texted me and said he would come and rob" Massaro. *Id.* at 133. Pharo testified regarding Appellant's text message to her:

> [Pharo:] [J]ust looking at this screen, it says from [Appellant]. This is from his phone number. I'll come down the [*sic*] and rob him with my scheme [*sic*] mask and knife.

*Id.* Pharo explained "scheme mask" meant "ski mask." *Id.*

> Pharo testified regarding what transpired after she left Massaro's house:

> I walked down the block and I waited for [Appellant]. And he pulled up, but it was … a while later, probably, like, after a half hour later after I texted him.

> ….

> I get in the car and [Appellant] starts driving and he pulls over onto the right. And we're in the car and he's telling me[,] … I'm going to go rob him, and I'm like, No, [Massaro] said he doesn't have any money or anything so there's no point. Like, let's just go home. [Appellant] was like, All right. I'm gonna get out of the car and I'm gonna try and see if I can get in the house.

- 9 -

So [Appellant] gets out of the car and he walks to [Massaro's] house. And I guess he tried to go in, but I don't know what happened because I wasn't there. But he came back to the car and said, I couldn't get in and I think the neighbors s[aw] me, so you got to go in the house.

And I told him I didn't want to. I said I want to go home, like, to the baby. … [H]e just kept tellin[g] me no, just go in the house….

*Id.* at 134-35.

Pharo testified that she went back to Massaro's house. *Id.* at 137. According to Pharo, she told Massaro that she needed to use his bathroom. *Id.* Pharo testified that Appellant entered behind her "wearing a ski mask, a black hoodie, gray joggers, and white sneakers[.]" *Id.* at 195. Pharo admitted that the ski mask was not "fully on when I seen him[,]" but was on top of Appellant's head. *Id.*

Upon entering Massaro's home, Pharo went upstairs to the bathroom. *Id.* at 137. While inside the bathroom, Pharo snorted a crushed Percocet tablet. *Id.* at 138. Pharo testified what next transpired:

I hear[d] somebody come up the steps and I guess it was [Massaro]. And then maybe like five minutes later, I heard somebody come up the steps … again. And then I heard [Massaro] say, What the fuck are you doing in my house, you junkie? And then [Appellant] was saying something about a computer. And [Massaro] was like, Oh, … what the fuck did you do that for? And then I didn't hear anything else after that.

….

[Appellant] comes and bangs on the bathroom door, and he's like, Get out of the bathroom, Vann [(meaning Pharo)]. And I open up the bathroom door and … [Appellant's] face was real pale and he

- 10 -

was like, I fucked up. I was like, What do you mean you fucked up?

So … I came out of the bathroom and I looked to the left, and I [saw Massaro's] foot. So I … didn't know what happened. I just thought that … he got hurt or something. And we left and I called the cops when … I got in the car.

*Id.* at 138-39.

Audio of Pharo's 911 call was played to the jury. *Id.* at 178. According to Pharo, a police officer returned her call. *Id.* at 182. Pharo "told them that my friend needed help and [the officer] called me, and they asked me to call [Massaro's] phone and I did." *Id.* Pharo attempted to call Massaro three or four times. *Id.* Pharo expressly testified that Appellant killed Massaro. *Id.* at 189.

Pharo further testified that after the murder, Appellant drove to Penn Treaty Park, where he unsuccessfully attempted to dispose of his clothing worn during the attack. *Id.* at 140. Immediately thereafter, he drove to Delaware Avenue, where he told Appellant to throw his pants, sneakers and sweater into the sewer. *Id.* at 140-41. Pharo complied. *Id.* at 141.

During the police investigation, Pharo initially told police that

[s]omebody came into [Massaro's] house and tried to rob him. But I didn't know … that he was stabbed or anything, so [police] told me that.

*Id.* at 143. Eventually, Pharo gave police a statement claiming that she held the knife that killed Massaro. *Id.*

- 11 -

Pharo admitted that she subsequently pled guilty to third-degree murder, robbery, and conspiracy. *Id.* at 189. At the time of trial, Pharo had not yet been sentenced. *Id.* at 190. Pharo denied being promised a specific prison term as part of her plea deal. *Id.* at 191. However, Pharo's plea agreement provided that, if Pharo complied with the agreement,

> the district attorney will testify at her sentencing, inform the sentencing court of the extent of [] Pharo's cooperation during any testimony she provided at any hearing or trial, and agree that her aggregate sentence shall be no more than the mitigated range of the standard matrix of the sentencing guidelines for the lead charge in this case ….

*Id.* at 192. Pharo also confirmed identifying Appellant as Massaro's killer at Appellant's preliminary hearing. *Id.* at 195.

The Commonwealth additionally presented the testimony of a forensic pathologist, Dr. Simon. *Id.* at 149. Dr. Simon explained that she has been employed by the medical examiner's office for six and one-half years. *Id.* Dr. Simon testified that she reviewed files regarding the post-mortem examination of Massaro. *Id.* at 150. Her review included

> reviewing the entire case file, which means the circumstances that were initially reported to us regarding the death, the identification statement given by the next of kin, the autopsy report, the toxicology report, and any photography that may have been taken during the exam.

*Id.* Dr. Simon testified that Massaro's knife wound went through his sternum and into the aorta. *Id.* at 157.

During cross examination, Dr. Simon opined that, theoretically, a person could

walk into a knife like that. But like I said, when [the knife] gets to a bone, it would be very difficult to keep walking at enough force to make the knife go through. I imagine realistically[,] for a person to theoretically run into the knife, they would really need to be running or charging at the knife for it to perforate his sternum.

*Id.* at 163 (paragraph break omitted). However, Dr. Simon opined that Massaro's death was caused by a stab wound of the torso, and the manner of death was a homicide. *Id.* at 158.

The trial court concluded sufficient evidence supported Appellant's convictions. Trial Court Opinion, 10/18/23, at 9. The trial court opined Pharo's testimony presented "compelling circumstantial evidence that [Appellant] was attempting to steal from Massaro when he stabbed and killed him." *Id.* The trial court further observed,

Pharo's testimony was corroborated by other compelling evidence. The Commonwealth presented an audio recording of [Appellant] that was made by Joseph Friend, Pharo's stepfather, a day after the murder occurred. N.T.[,] 1/5/22[,] at 205-09. In that recorded conversation, [Appellant] admitted his responsibility for killing Massaro. N.T.[,] 1/5/22[,] at 208-09; Commonwealth Exhibit 58. Pharo's testimony was also corroborated by text messages on her phone from [Appellant,] as well as cell site location data. [Appellant] texted Pharo just before 11:45 p.m. on the night of the murder that he would "come down the [*sic*] and rob him with my scheme [*sic*] mask and knife." N.T.[,] 1/5/22[,] at 133; N.T.[,] 1/5/22[,] at 126-27. Approximately 20-30 minutes after this text message, cell site location data established that [Appellant] had left his home and arrived in Massaro's neighborhood. N.T.[,] 1/5/22[,] at 185. Pharo and [Appellant's] phones stayed in the area for approximately an hour. N.T.[,] 1/5/22[,] at 185-86. Both phones arrived back to [Appellant's] house at approximately the same time. *See* N.T.[,] 1/5/22[,] at 187-89. Accordingly, the record establishes that the Commonwealth presented overwhelming evidence that [Appellant] was attempting to commit a theft from Massaro when

- 13 -

he stabbed and killed him, and that he committed the crimes of conspiracy, robbery and second[-]degree murder.

*Id.* The record supports the trial court's reasoning, and its legal conclusion is sound. *Id.* Because sufficient evidence supported Appellant's convictions, Appellant's first issue merits no relief.

In his second issue, Appellant claims the trial court improperly rejected his challenge to the verdict as against the weight of the evidence. Appellant's Brief at 19. Appellant argues his conviction "was based on the testimony of an utterly incredible witness with every motive in the world to implicate [Appellant]." *Id.* According to Appellant, Pharo "killed the victim and then blamed [Appellant] in order to avoid a lengthy prison sentence." *Id.* He argues Pharo's testimony "was entitled to no weight," and he should have been acquitted. *Id.*

Appellant again argues the evidence failed to establish a robbery. *Id.* at 20. He asserts,

> [i]n the same way, the verdict was against the weight of the evidence. There was simply no way that any reasonable factfinder could have concluded that [Appellant] was involved in a robbery or attempted robbery, and by extension, conspiracy or second[-]degree murder.

*Id.*

> A challenge to the weight of the evidence
>
> is not premised upon trial court error or some discrete and correctable event at trial, but instead ripens only after, and because of, the jury's ultimate verdict in the case. As a result, a claim asserting that the verdict was against the weight of the evidence rests within the trial court's discretion. We review

the trial court's exercise of discretion in ruling on the claim, and not whether the verdict was against the weight of the evidence. The trial court is required to consider whether the jury's verdict is so contrary to the evidence as to shock one's sense of justice and the award of a new trial is imperative[.] …

….

… A motion for new trial on the grounds that the verdict is contrary to the weight of the evidence, concedes that there is sufficient evidence to sustain the verdict. When ruling on a weight claim, the trial court must determine whether certain facts are so clearly of greater weight that to ignore them, or to give them equal weight with all the facts, is to deny justice….

*Commonwealth v. Holt*, 273 A.3d 514, 531-32 (Pa. 2022) (internal quotation marks and citations omitted).

Appellant's claim basically challenges the credibility of Pharo. We decline Appellant's invitation to act as fact-finder, reweigh the evidence, and disturb credibility findings based on a cold record. *See Commonwealth v. Sanchez*, 262 A.3d 1283, 1288-89 (Pa. Super. 2021) ("[I]t is not the function of the appellate court to substitute its judgment based on a cold record for that of the trial court. The weight to be accorded [] evidence is exclusively for the fact finder, whose findings will not be disturbed on appeal if they are supported by the record." (citations omitted)). "One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was … against the weight of evidence[.]" *Commonwealth v. Clay*, 64 A.3d 1049, 1055 (Pa. 2013) (citation omitted).

Our review discloses no abuse of the trial court's discretion in denying Appellant's challenge to the weight of the evidence. Accordingly, Appellant's second issue merits no relief.

In his third issue, Appellant argues that the trial court improperly permitted the Commonwealth to present cellular site data, in violation of the rule against hearsay evidence. Appellant's Brief at 21. Appellant claims the Commonwealth offered the cellular location data "for the purpose of bolstering the testimony of its star witness," Pharo. **Id.** Appellant asserts this data was prepared outside of the courtroom. **Id.** at 22. According to Appellant,

> [t]he purpose for which the Commonwealth used the data was to show the movement of the phones it attributed to both [] Pharo and [Appellant] around the time of the killing. It was used to suggest that Pharo was testifying truthfully in [c]ourt. The information—and more specifically, the accuracy of the information—was critical.

**Id.**

Appellant claims the information was transcribed and provided to the Commonwealth in response to a subpoena. **Id.** However, Appellant argues, there was no evidence regarding the data's collection, storage, and accuracy. **Id.** Appellant claims the Commonwealth asserted no exception to the rule against hearsay evidence. **Id.** at 23. Further, Appellant argues the trial court's error in admitting the evidence was not harmless. **Id.** at 24. Appellant points to Pharo's motivation for testifying in this case, including her arrest and plea deal. **Id.** at 24-25.

Our standard of review is well-settled:

In reviewing a trial court's ruling on the admissibility of evidence, our standard of review is one of deference. Questions concerning the admissibility of evidence are within the sound discretion of the trial court, and its discretion will not be reversed absent a clear abuse of discretion. An abuse of discretion is not merely an error of judgment, but is rather the overriding or misapplication of the law, or the exercise of judgment that is manifestly unreasonable, or the result of bias, prejudice, ill[-]will[,] or partiality, as shown by the evidence of record. Furthermore, if in reaching a conclusion the trial court [overrides] or misapplies the law, discretion is then abused and it is the duty of the appellate court to correct the error.

*Commonwealth v. Thompson*, 106 A.3d 742, 754 (Pa. Super. 2014)

(internal citations and quotation marks omitted).

Regarding the rule against hearsay evidence,

Pennsylvania's hearsay rule explains that hearsay is a statement that: "(1) the declarant [did] not make while testifying at the current trial or hearing and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." Pa.R.E. 801(c)(1)-(2). The Rule defines a "statement" as "a person's oral assertion, written assertion, or nonverbal conduct, if the person intended it as an assertion," and a "declarant" is "the person who made the statement." *Id.* at 801(a)-(b) (emphasis added).

In *Commonwealth v. Wallace*, 289 A.3d 894 (Pa. 2023), our Supreme Court recently held that GPS data is not hearsay evidence. *Id.* at 907-08. The *Wallace* Court explained that GPS location data is not a statement made by a person; rather, it is data collected electronically. *Id.* at 904. As such, GPS location data cannot constitute hearsay because Rule 801 is clear that "a statement is a written or oral assertion of a person." *Id.* (emphasis in original). Accordingly, pursuant to the holding in *Wallace* and the plain language of Rule 801, an automatically generated GPS record … does not constitute a statement, and therefore, is not hearsay….

*Commonwealth v. Vance*, ___ A.3d ___, 2024 Pa. Super. LEXIS 191, *8-9,

2024 PA Super 99 (Pa. Super. filed May 15, 2024) (slip op. at 7-8).

The trial court rejected Appellant's claim of error:

Here, [Appellant] contends that cell site location data tracking the movement of the phones of [Appellant] and Pharo were inadmissible hearsay. However, at trial, Agent James Dunlap, an expert in the field of historic cell site analysis, testified that cell site data is generated electronically when a chip inside a cellphone connects with cellphone tower in the network to complete a text or call. N.T.[,] 1/5/22[,] at 164-175. Because the data are not assertions of a person, they are not hearsay. **Wallace**, 289 A.3d at 904-906. No relief is due.

Trial Court Opinion, 10/18/23, at 11. We agree with the trial court's sound reasoning and conclusion. ***See id.*** Appellant's third issue merits no relief. ***See id.***

In his fourth issue, Appellant argues the trial court improperly admitted Pharo's text exchanges with Appellant, without proper authentication. Appellant's Brief at 25. Appellant claims the Commonwealth "offered text messages and attributed these messages to [Appellant,] without properly authenticating the same." ***Id.*** at 25-26. According to Appellant,

[t]he text messages came through an app[lication] which had no connection to [Appellant] and were in a different name. Moreover, Pharo's claims about the text messages were undermined by the fact that the number attributed to Pharo was sending text messages *after* she was in police custody. The jury was thus improperly permitted to consider and weigh[] this evidence.

***Id.*** at 27 (footnoted omitted, emphasis in original). Appellant argues this error was not harmless, as the evidence bolstered Pharo's testimony. ***Id.***

Pennsylvania Rule of Evidence 901(b)(11) specifically addresses the authentication of "digital evidence," which is defined as "a communication, statement, or image existing in an electronic medium," such as "emails, text

- 18 -

messages, social media postings, and images." Pa.R.E. 901(b)(11), cmt. The rule provides that a proponent may show that an individual or entity is connected to digital evidence through:

> (A) direct evidence such as testimony of a person with personal knowledge; or
>
> (B) circumstantial evidence such as:
>
> > (i) identifying content; or
> >
> > (ii) proof of ownership, possession, control, or access to a device or account at the relevant time when corroborated by circumstances indicating authorship.

Pa.R.E. 901(b)(11).

> This Court expounded,
>
> [t]he comment to Rule 901 further clarifies that "the proponent of digital evidence is not required to prove that no one else could be the author. Rather, the proponent must produce sufficient evidence to support a finding that a particular person or entity was the author." Pa.R.E. 901, cmt. Furthermore,
>
> > [c]ircumstantial evidence of identifying content under Pa.R.E. 901(b)(11)(B)(i) may include self-identification or other distinctive characteristics, including a display of knowledge only possessed by the author. Circumstantial evidence of content may be sufficient to connect the digital evidence to its author.
> >
> > Circumstantial evidence of ownership, possession, control, or access to a device or account alone is insufficient for authentication of authorship of digital evidence under Pa.R.E. 901(b)(11)(B)(ii). *See*, *e.g.*, ***Commonwealth v. Mangel***, 181 A.3d 1154, 1163 (Pa. Super. 2018) (social media account bearing [the appellant's] name, hometown, and high school was insufficient to authenticate the online and mobile device chat messages as having been authored by defendant). However, this evidence is probative in combination with other evidence of the author's identity.

Pa.R.E. 901, cmt.

***Commonwealth v. Watkins***, ___ A.3d ___, 2024 Pa. Super. LEXIS 141, *8-9, 2024 PA Super 77 (Pa. Super. filed April 19, 2024) (slip op. at 7).

Instantly, the trial court explained why it rejected Appellant's claim:

[T]here was ample evidence to prove that the text messages admitted at trial were authentic. The authenticity of the text messages between the phone numbers of Pharo and [Appellant] was established through the testimony of Pharo. Pharo testified that, on the night of the murder, she was texting [Appellant] at his phone number and could tell from the conversation that she was talking to [Appellant], with whom she had [been in] a relationship for approximately seven years. N.T.[,] 1/4/22[,] at 101, 118-34, 203-11; N.T.[,] 1/5/22[,] at 29-30. The text message conversation between Pharo and [Appellant's] phone numbers in the hours before the murder pertained to their relationship and, specifically, plans for their daughter. N.T.[,] 1/4/22[,] at 204-05. Furthermore, Pharo knew [Appellant's] phone number and had it saved in her phone under "Shayne." N.T.[,] 1/4/22[,] at 124-25; N.T.[,] 1/5/22[,] at 124. This phone number was associated with the phone detectives collected [from Appellant] in the case. **See** N.T.[,] 1/5/22[,] at 99, 124, 166; Commonwealth Exhibit 68 ([Appellant's] Phone Extract). Furthermore, Detective Thorsten Lucke, an expert in the field of cell phone data examination, testified that, in order to confirm the owners of both devices, he looked at the phones' contents, which included photos, emails, and communications. N.T.[,] 1/5/22[,] at 100-101.

Pharo's testimony also established the authenticity of the messages sent to and from the "Alicia" phone number. Pharo testified that, on the night of the murder, she was not only texting [Appellant] at his phone number but also at the number saved in her phone as "Alicia," which was generated using the text [application]. N.T.[,] 1/4/22[,] at 119-25; N.T.[,] 1/5/22[,] at 24-25. Pharo stated that before she left [Appellant's] house that night, she and [Appellant] planned that he would text her as "Alicia" through the text app in order to implement their scheme. N.T.[,] 1/4/22[,] at 121-22, 205-07. Pharo stated this was a

scheme that she and [Appellant] had used successfully in the past. N.T. 1/4/22[,] at 120.

Finally, at trial, defense counsel argued that certain messages in Pharo's cell phone extraction could not be authenticated[,] because they were sent after Pharo was brought [into the] homicide [unit] when she was without her phone, and that she denied sending the messages. N.T.[,] 1/5/22[,] at 78-79. However, evidence adduced at trial established that [Appellant] was in possession of Pharo's phone at the time the messages were sent. Pharo testified that, when police brought her to the homicide unit, she left her phone with her daughter, but that [Appellant] also had access to the phone at this time. N.T.[,] 1/5/22[,] at 11, 28.

Accordingly, there was sufficient evidence to establish that the text messages admitted at trial were authentic….

Trial Court Opinion, 10/18/23, at 13-14. We agree with the sound reasoning of the trial court, and affirm on this basis regarding Appellant's evidentiary challenge. *See id.* Appellant's fourth issue merits no relief.

In his fifth issue, Appellant argues that at trial, the trial court improperly permitted the Commonwealth to play audio recordings of Appellant, which were made without his knowledge and consent. Appellant's Brief at 28. Appellant claims that the recordings were made in violation of Pennsylvania's Wiretap Act, 18 Pa.C.S.A. §§ 5701-5782. Appellant's Brief at 28.

Our review of the record discloses that Appellant did not raise this issue before or during trial. As the trial court cogently explained,

[Appellant's] claim that the [c]ourt erred in allowing the Commonwealth to offer the recording was never raised in the trial court. [Appellant's c]ounsel never moved to exclude the recording *in limine* and did not object to the recording when it was presented at trial. Accordingly[, Appellant's] claim is waived. Pa.R.E. 103(a)[(1)] [("A party may claim error in a ruling to admit or

exclude evidence only … [if the party] makes a timely objection, motion to strike, or motion *in limine*[,]" and "states the specific ground, unless it is apparent from the context[.]"); Pa.R.A.P. 302(a) ("Issues not raised in the lower court are waived and cannot be raised for the first time on appeal.")….

Trial Court Opinion, 10/18/23, at 15. We agree with the trial court's reasoning and its legal conclusion is sound. *See id.* Appellant waived this issue and is entitled to no relief.

To the extent Appellant claims ineffective assistance of counsel in failing to preserve this issue, we observe the following: "Generally, a criminal defendant may not assert claims of ineffective assistance of counsel on direct appeal." *Commonwealth v. James*, 297 A.3d 755, 760 (Pa. Super. 2023). "Instead, such claims are to be deferred to PCRA review." *Id.* Our Supreme Court has recognized three exceptions to this general rule: (1) where "there are extraordinary circumstances in which trial counsel's ineffectiveness is apparent from the record and meritorious to the extent that immediate consideration best serves the interests of justice"; (2) where "there is good cause shown, and the defendant knowingly and expressly waives his entitlement to seek subsequent PCRA review of his conviction and sentence;" and (3) "where the defendant is statutorily precluded from obtaining subsequent PCRA review." *Id.* at 761 (internal quotation marks omitted).

Appellant's claim does not fall within any of these exceptions. *See* Trial Court Opinion, 10/18/23, at 16. As such, this issue is not reviewable on direct appeal. *See James*, 297 A.3d at 761 (recognizing that claims not

falling within any of the exceptions must be deferred until collateral review). Appellant's fifth issue fails. We therefore affirm Appellant's judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 8/6/2024