J-S21032-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| DALE SATTAR | : | |
| | : | |
| Appellant | : | No. 1724 EDA 2024 |

Appeal from the Judgment of Sentence Entered February 15, 2024
In the Court of Common Pleas of Montgomery County Criminal Division
at No(s): CP-46-CR-0001940-2021

BEFORE:   KUNSELMAN, J., KING, J., and FORD ELLIOTT, P.J.E.[*]

MEMORANDUM BY FORD ELLIOTT, P.J.E.:          **FILED OCTOBER 23, 2025**

Appellant, Dale Sattar, appeals from the judgment of sentence imposed after his bench convictions of four summary offenses: criminal mischief – intentionally damaging real property; retaliation against witness, victim or party in a civil matter; loitering and prowling at night time; and defiant trespass.[1] He challenges the sufficiency of the evidence for three of the four convictions, the weight of the evidence for all four of the convictions, and the court's failure to grant his pretrial motion in *limine* to prohibit a police officer from narrating the surveillance video. We affirm.

The trial court accurately summarized the evidence at trial, as follows:

> At approximately 6:00 a.m. on November 9, 2020, the [Lower Merion Police Department ("LMPD")] was notified of an alarm

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S. §§ 3304(a)(5), 4953(a), 5506 and 3503(b)(1)(iii), respectively.

activation at 234 River Road ("Property") in the Gladwyne section of Lower Merion Township. Jonathan Reichlin, his wife, and their daughter live at the Property. They were not home on November 9, 2020. No one was permitted on their Property on November 9, 2020.

Sergeant Ronald Eckert [] and Officer Robert Manney [] responded to the Property. At the time of the suppression hearing/bench trial, Sgt. Eckert had been employed with the LMPD for 12 years. He was employed as a patrol supervisor (both at the time of the instant investigation as well as the time of the bench trial). At the time of trial, Sgt. Eckert had investigated approximately 50 to 100 burglaries, criminal trespasses, and similar offenses.

Upon arrival at the Property, Sgt. Eckert and Ofc. Manney began to search its exterior. They started at the front door. The Property shares a driveway with 236 River Road (which is Appellant's residence). A fence encloses the rear of the Property. At the rear of the Property, Sgt. Eckert and Ofc. Manney observed footprints on the second-story patio as well as the stairs to this patio. They observed seven (7) broken windows on the patio. As they continued to walk around the Property, they saw additional shattered windows. At that point, they called for additional manpower so they could establish a perimeter and put officers on the outside of the Property.

Once additional police officers had arrived at the Property, the police entered the Property. They did not locate anyone inside, and they concluded that a burglary had not occurred because nothing appeared to have been ransacked.

Officer Jeffrey Seamans [] of the LMPD also responded to the Property on November 9, 2020. At the time of the bench trial, Ofc. Seamans had been employed with the LMPD for approximately 12 years. At the time of the incident described herein, Ofc. Seamans was assigned to LMPD's K-9 unit; his K-9 was Rookie. K-9 Rookie was trained in patrol and explosive detection. In the fall of 2015, Ofc. Seamans and K-9 Rookie attended basic patrol school (which is approximately 10 weeks in duration), and they were trained in tracking, criminal apprehension, building searches, and evidence searches. From 2015 to 2020, K-9 Rookie had completed 50 to 60 tracks, in addition to building searches and evidence searches.

On the morning of November 9, 2020, Ofc. Seamans' on-duty supervisor directed him to respond to the Property with K-9 Rookie as part of an investigation of a possible burglary. When Ofc.

Seamans and K-9 Rookie arrived at the Property, there were three (3) or four (4) police officers already present, and a perimeter had been established such that, other than law enforcement, no one could enter or leave the scene. The officers onsite advised Ofc. Seamans that multiple windows had been smashed. [Officer] Seamans was directed to utilize K-9 Rookie to conduct a track to see whether anyone had been at the Property and left or whether anyone was inside the residence. Specifically, K-9 Rookie was tracking for recent human odor. K-9 Rookie is trained to track recent human odor until the odor dissipates/ends; a natural barrier prevents her from tracking further; or she is commanded to stop tracking.

[Officer] Seamans commanded K-9 Rookie to start tracking at the Property. [Officer] Seamans took a Google satellite view of the Property and drew arrows on it indicating K-9 Rookie's tracking path of the Property on the morning of November 9, 2020. K-9 Rookie immediately shot down the Property's shared driveway, on the west side of the Property. She then went to the rear of the Property and proceeded up the steps to the second-floor patio. She then came down the steps and continued around the Property until she again reached the driveway shared by the Property and Appellant's property. At that point, K-9 Rookie pulled Ofc. Seamans across the shared driveway onto Appellant's property and to the front door of Appellant's residence, which is indicated in the photo admitted as Exhibit C-15.

K-9 Rookie went up to a pair of brown dress shoes near [Appellant's] front door, took a deep breath, and her tail stood straight up and wagged slightly, which indicated that those shoes had recent human odor in them. There was no fencing in that area, and Ofc. Seamans could clearly see the brown dress shoes. [Officer] Seamans told other officers that K-9 Rookie had alerted (indicating the presence of recent human odor) to those brown dress shoes.

[Officer] Stieber also responded to the Property on November 9, 2020. At the time of trial, Ofc. Stieber had been employed as a police officer with LMPD for approximately 19 years. At the time of this incident, Ofc. Stieber worked as a platoon investigator. On that day, Ofc. Stieber's on-duty sergeant directed him to respond to the Property to assist in the investigation as the assigned investigator. Upon his arrival, Sgt. Eckert, Ofc. Manney, and Ofc. Seamans briefed him that there was an alarm activation received; they had discovered broken windows in the rear and side of the

- 3 -

Property; there was no entry into the Property; and Ofc. Seamans was going to conduct a track of the area with K-9 Rookie. [Sergeant] Eckert brought Ofc. Stieber to the Property's second-floor patio and pointed out the footprints he had observed in the dew on the patio. [Officer] Stieber testified that the footprints appeared to be made by a dress-style shoe with no tread as opposed to a boot, sneaker, or regular shoe.

Ofc. Stieber left the patio and was informed by Ofc. Seamans that K-9 Rookie had done a track around the Property and tracked directly to Appellant's front door where Ofc. Seamans saw a pair of brown dress shoes.

While standing near the front door of the Property, Ofc. Stieber could see the brown dress shoes on Appellant's front doorstep. [Officer] Stieber did not observe any fencing around Appellant's front doorstep area; nor did he observe any "Do not enter" signs. Ofc. Stieber then walked to Appellant's front doorstep and saw the brown dress shoes. Based on K-9 Rookie's track to the brown dress shoes, as well as having seen the footprints on the Property's patio, Ofc. Stieber seized the brown dress shoes.

On the day of the incident (November 9, 2020), in addition to providing the garage code to Ofc. Manney, Mr. Reichlin's wife informed him that the Property had surveillance video. [Officer] Manney relayed this information to Ofc. Stieber. The surveillance footage was not available for a couple days so the police had not seen said footage when Ofc. Stieber seized the brown dress shoes from Appellant's front doorstep on November 9, 2020.

On November 9, 2020, Mr. Reichlin's alarm company notified his wife that the alarm had been activated at their Property. There are multiple surveillance cameras at the Property, one of which is pointed at the shared driveway of the Property and [Appellant's] property. This camera also partially shows the front of Appellant's property. [] Reichlin's relationship with Appellant is adversarial and unpleasant. Appellant is not permitted on the Property. Prior to the damage to the Property's windows on November 9, 2020, Appellant had lost a civil suit he had filed against [] Reichlin.

[] Reichlin's wife provided the Property's surveillance footage to Ofc. Stieber. Footage of November 9, 2020 from the camera labeled "front driveway" shows the following:

- 4 -

| TIME (a.m.) | DESCRIPTION |
|---|---|
| 5:29:42 | Interior lights of Appellant's garage turned on |
| 5:31 | Person seen walking inside Appellant's garage: a couple seconds later, the interior garage lights turned off |
| 5:32:15 | Person seen in Appellant's garage bending down and looking in the direction of the Property |
| 5:41:22 | Person seen walking on Appellant's property holding an illuminated flashlight and walking toward River Road |
| 5:52:47 | Interior light in Appellant's garage turned on and person seen walking into garage |
| 5:52:26 | Interior lights in Appellant's garage turned off |

Footage of November 9, 2020 from the camera labeled "backyard" shows the following:

| TIME (a.m.) | DESCRIPTION |
|---|---|
| 5:44:31 | Person enters camera view wearing a long-sleeved, hooded garment pulled up and holding an illuminated flashlight in right hand and claw hammer in left hand. The person walks under the Property's second-floor patio. |
| 5:47:50 | Person seen carrying an illuminated flashlight in right hand and walking along the Property's backyard under the second-story patio. |

It is undisputed that the LMPD did not have a search warrant at the time they seized the brown dress shoes from Appellant's front door step.

The damage caused to the Property was $37,500.

Opinion, Branca, J., Sep. 4, 2024, ("Trial Court Opinion"), 4-10 (footnotes with record citations omitted).

Appellant filed a motion in *limine* on January 17, 2024, raising nine separately enumerated claims. **See** Appellant's Motion in *Limine*, 1/17/24, 1-10. Relevant to Appellant's present claim of trial court error, he sought to "exclude and prevent" police officers from narrating the surveillance video or identifying him on the video because: the officers lacked personal knowledge under Pa.R.E. 602; any identification of him would violate Pa.R.E. 404(b) as it would imply he was known to police; and the officers cannot properly authenticate the video under Pa.R.E. 902 as they do not have knowledge of what is depicted on the video. **See** Appellant's Motion in *Limine*, 1/17/24, 6-8. "It does not appear from the record that this motion was addressed, nor did Appellant bring it to the court's attention at the suppression hearing/bench trial on January 26, 2024." Trial Court Opinion, 2.

Appellant also sought to suppress the brown shoes recovered from his front doorstep without a warrant. The suppression hearing was held immediately prior to trial. "At the conclusion of the suppression hearing, the Court: (1) denied suppression of K-9 Rookie's tracking to the pair of brown dress shoes on Appellant's front doorstep; and (2) granted suppression of the brown dress shoes themselves and any testimony regarding the soles of the shoes." Trial Court Opinion, 3. **See also** N.T. 1/26/24, 77-78.[2]

---

[2] Immediately prior to the motion to suppress, the Commonwealth amended the first three counts to grade the offenses as summaries, thereby making all four counts charged summary offense. **See** N.T. 1/26/24, 4-5.

The relevant non-hearsay testimony from the suppression hearing was incorporated into the trial record. N.T. 1/26/24, 78. In addition to the admitted suppression testimony, the homeowner testified about the damage done to his home, his on-going adversarial relationship with Appellant following a civil suit between them, the security system for his home and the surveillance tapes turned over to the LMPD. *See id.*, 79-87. Officer Stieber was recalled and testified about the surveillance tapes from the incident, which depicted a shadowy figure walking from Appellant's garage to the street, from the street into the backyard of the Property, traveling towards the stairs to the second-story patio while holding a claw-style hammer, and after that returning to Appellant's garage. *See id.*, 89-99. At the conclusion of the evidence, the trial court found Appellant guilty of all the above-referenced charges. *Id.*, 108.

On February 15, 2024, the trial court imposed consecutive terms of 90 days' probation on each of the four convictions, and, based on evidence presented at the sentencing hearing, ordered restitution in the amount of $34,283.58, to be paid within 12 months. *See* Trial Court Opinion, 3. On Monday, February 26, 2024, Appellant filed a post-sentence motion arguing, *inter alia*, "that the verdict of guilty for the four guilty convictions was against the weight of the evidence in violation of Pa.R.Crim.P. 607." Appellant's Post-Verdict Motion, 2/26/24, ¶ 8. On April 8, 2024, Appellant, through present direct appeal counsel, filed an amended motion to include new claims concerning the K-9 dog sniff-based evidence. *See* Appellant's Amended Post-Verdict Motion, 4/8/24, ¶¶ 1-11. On May 5, 2024, the trial court denied both

of Appellant's post-sentence motions. *See* Order, 5/31/24 (denying "Post-Verdict Motion"); Order, 5/31/24 (denying "Amended Post-Verdict Motion").

On June 7, 2024, Appellant, through counsel, filed a timely notice of appeal. On June 17, 2024, the trial court ordered Appellant to file a "Concise Statement of [Errors] Complained of on Appeal." *See* Order, 6/17/24; Pa.R.A.P. 1925(b). Appellant complied with the order, raising five issues for review. *See* Appellant's Concise Statement of [Errors] Complained of on Appeal, 7/8/24.

Appellant presents three questions for our review, as follows:

1. Was there sufficient evidence to prove the *mens rea* and *actus reus* of disorderly conduct, criminal mischief and defiant trespass?

2. Was the verdict of guilty at trial against the weight of the evidence on all 4 charges?

3. Should the trial court have granted [Appellant's] Motion in *Limine* preventing the narration of the surveillance video, the only identification evidence presented and unequivocally identifying [him] as the person therein despite a[ lack of] personal knowledge of the events depicted in said video?

Appellant's Brief, 3 (suggested answers omitted).

In his first argument, Appellant contends that "there is no evidence sufficient to sustain the element of identification [of him] being the actor in the video; moreover, the video does not show the figure identified as Appellant actually breaking any windows." Appellant's brief, 9-10. He then summarizes Officer Stieber's testimony about the "video depicting events that no one saw," and argues that no testimony implicated him in the destruction of the

property. ***Id.***, 10. While he acknowledges that the evidence of identity was circumstantial, he asserts it was "too weak without any suggestive narration" of the video by the officer. ***Id.*** Appellant argues that there was "no independent testimony or evidence to corroborate that the time stamps in the video are accurate," and "no one with sufficient knowledge [] to identify him as the person in the video." ***Id.***

When reviewing a sufficiency claim, we construe "all the evidence admitted at trial in the light most favorable to the verdict winner[;]" the evidence is legally sufficient when it would "enable the fact-finder to find every element of the crime beyond a reasonable doubt." ***Commonwealth v. Brockman***, 167 A.3d 29, 38 (Pa. Super. 2017) (citation omitted). The Commonwealth may prove an offense by means of wholly circumstantial evidence, and the evidence presented "need not preclude every possibility of innocence." ***Id***. (citation omitted). It is the job of the fact-finder to pass upon "the credibility of witnesses and the weight of the evidence produced," and the fact-finder "is free to believe all, part or none of the evidence." ***Id***. "Whether evidence was **properly** admitted does not factor into our analysis, as sufficiency is not determined upon a diminished record." ***Commonwealth v. Bowens***, 265 A.3d 730, 741 (Pa. Super. 2021) (*en banc*) (emphasis in original); ***see also Commonwealth v. Smith***, 568 A.2d 600, 603 (Pa. 1989) ("The question of sufficiency is not assessed upon a diminished record").

"Proof beyond a reasonable doubt of the identity of the accused as the person who committed the crime is essential to a conviction."

*Commonwealth v. Hickman*, 309 A.2d 564, 566 (Pa. 1973). "[G]uilt must be based on facts and conditions proved, and not on suspicion or surmise." *Commonwealth v. Eckrote*, 12 A.3d 383, 386 (Pa. Super. 2010). "However, entirely circumstantial evidence is sufficient so long as the combination of the evidence links the accused to the crime beyond a reasonable doubt." *Id.*

In contrast to his statement of the question involved, which explicitly asserts the insufficiency of the evidence of the *mens rea* and *actus reus* for three of his four convictions, Appellant's argument focuses only on an alleged lack of evidence that he was the perpetrator that broke the windows on the Property.[3] *See* Appellant's Brief, 9-10. More specifically, he asserts that the evidence failed to prove he was the perpetrator because there was no direct testimony identifying him. *See id.* However, Appellant's identity as the perpetrator, like any element of a crime, may be proven by circumstantial evidence. *See Commonwealth v. Santiago,* 980 A.2d 659, 662 (Pa. Super. 2009) ("Circumstantial evidence can itself be sufficient to prove any element or all of the elements of the crime of a criminal homicide") (citation omitted);

_____

[3] Because Appellant has not developed any argument challenging the elements of the offenses for which he was convicted other than identity, we hold that he has abandoned that part of his sufficiency claim. *See Commonwealth v. Cotto*, 753 A.2d 217, 224 n.6 Pa. (2000) (claims that have not been developed beyond unsupported assertions are abandoned on appeal "and we, of course, will not develop the claims for appellant"); *Commonwealth v. Hawkins*, 810 A.2d 668, 672 (Pa. Super. 2002) (declining to review an issue raised in statement of questions involved, but which the appellant failed to address in his brief). Moreover, the trial court thoroughly addressed the sufficiency of the evidence as to the elements of the offenses of which Appellant was convicted. *See* Trial Court Opinion, 11-14.

*Commonwealth v. Cunningham*, 805 A.2d 566, 571 (Pa. Super. 2002) (holding that "the record reflects sufficient circumstantial evidence to prove beyond a reasonable doubt that [Cunningham] participated in the crimes of which he was convicted"). Identification evidence "need not be positive and certain to sustain a conviction." *Commonwealth v. Jones*, 954 A.2d 1194, 1197 (Pa. Super. 2008).

Here, the trial court summarized the evidence proving Appellant's identity as the perpetrator, as follows:

> With respect to identification of [] Appellant, the Commonwealth produced video footage from Mr. Reichlin's security cameras that showed: (1) the interior lights of Appellant's garage turn on at 5:29:42 a.m.; (2) a person walking inside Appellant's garage at 5:31 a.m.; (3) a person in Appellant's garage bending down and looking in the direction of the Property at 5:32:15 a.m.; (4) a person walking on [Appellant's] property holding an illuminated flashlight and walking toward River Road at 5:41:22 a.m.; (5) at 5:44:31 a.m., a person walking under the Property's second-story patio wearing a long-sleeved, hooded garment pulled up while holding an illuminated flashlight in the right hand and claw hammer in the left hand; (6) at 5:52:47 a.m., the interior lights of Appellant's garage turn on and a person is seen walking in the garage; and (7) at 5:55:26 a.m., the interior lights in Appellant's garage turn off. The Court observed in watching the video footage that the person appeared to be of Appellant's smaller stature.
>
> Additionally, Mr. Reichlin testified that: (1) his relationship with Appellant was adversarial and unpleasant; and (2) prior to the damage to the Property on November 9, 2020, Appellant had lost a civil suit he had filed against Mr. Reichlin. Given this was not a burglary, the time of day (very early morning), the fact the Reichlins were away (which Appellant, as a neighbor, could readily observe), and lack of evidence that anyone else had motive to damage the Property, that would certainly provide a motive for Appellant to damage the Property.

> Moreover, the police observed fresh footprints in the dew on the Property's second-story patio and the stairs leading to the patio. K-9 Rookie tracked recent human odor to a pair of brown dress shoes on Appellant's front doorstep. Based on the above, sufficient circumstantial evidence was produced for the Court to conclude that Appellant was the person who damaged the Property.

Trial Court Opinion, 12-13.

After reviewing the record, we agree with the trial court. The circumstantial evidence shows that police officers responded at approximately 6:00 a.m. on November 9, 2020, to an alarm activation at the Property. *See* N.T. 1/26/24, 11-13, 85-86. When police officers arrived at the Property, they discovered many double-paned windows shattered from the outside and footprints in dew along the second-floor patio. *See id.*, 12, 16-17, 21. Video surveillance showed that from 5:29 to 5:55 a.m. on the same date, someone inside Appellant's garage left that garage, walked onto the Property carrying a hammer, proceeded to the steps leading to the second-floor patio of the Property where most of the damage was done, and then that same person walked back to Appellant's property. *See* N.T. 1/26/24, 86-87, 89-98. The latter point was corroborated by the K-9 track evidence of recent human odor leading from the second-floor patio to the door of Appellant's home. *See id.*, 28, 31-33. That Appellant had a motive from his failed lawsuit and generally adversarial relationship against his neighbors also supported the conclusion that the perpetrator was Appellant. *See id*., 80-81 To the extent that Appellant's argument also challenges whether the Commonwealth proved that the person in the video was the perpetrator of the damage to the Property, we find that the near proximity in time of the video evidence of someone

walking onto the Property to the alarm signal and arrival of police officers to find the damage was sufficient to prove that the person on the video was the perpetrator. Accordingly, Appellant is due no relief on this issue.

In his second claim, Appellant challenges the weight of the evidence. He argues "in the alternative" to his sufficiency claim, that "the evidence sustaining a verdict here is very little" and rests upon: "(1) [his] apparent motive because of a civil case and (2) his identification in a video by Officer Stieber." Appellant's Brief, 12. He contends that only Mr. Reichlin knew him and was not asked to identify the person in the video, and therefore the trial court "improperly weigh[ed] the fact that [he] may have had a motive stemming from a lost civil case too much in its decision" along with the circumstantial evidence. *Id.* Appellant also alleges that the identification of Appellant in the video "was not proper as argued in the third issue below." *Id.*

Our standard of review as to the denial of a weight claim by a trial court is to examine "the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence." *Commonwealth v. Clay*, 64 A.3d 1049, 1055 (Pa. 2013) (quoting *Commonwealth v. Widmer*, 744 A.2d 745, 753 (Pa. Super. 2000)) (emphasis omitted). In a post-sentence motion, a weight claim "is addressed to the discretion of the trial court." *Widmer*, 744 A.2d at 751. "In order for a defendant to prevail on a challenge to the weight of the evidence, 'the evidence must be so tenuous, vague and uncertain that the verdict shocks the conscience of the court.'" *Commonwealth v. Talbert*, 129 A.3d 536, 546 (Pa. Super. 2015) (quoting

- 13 -

*Commonwealth v. Sullivan*, 820 A.2d 795, 806 (Pa. Super. 2003)). A trial court's denial of a motion "based on a weight of the evidence claim is the least assailable of its rulings." *Commonwealth v. Diggs*, 949 A.2d 873, 880 (Pa. 2008).

"An appellate court's standard of review when presented with a weight of the evidence claim is distinct from the standard of review applied by the trial court." *Clay*, 64 A.3d at 1055. This Court must limit review to "whether the trial court abused its discretion by reaching a manifestly unreasonable judgment, misapplying the law, or basing its decision on partiality, prejudice, bias, or ill-will." *Id.* at 1056.

Because the focus of our review is the trial court's reasoning in denying Appellant's post-trial weight claim, we turn to the court's explanation of its decision:

> In the instant case, the evidence was not so tenuous, vague, and uncertain so as to shock the conscience of the Court. In fact, the evidence produced was clear and certain that Appellant committed the offenses for which he was convicted. The Commonwealth produced the following evidence: (1) police were notified of an alarm activation at the Property at approximately 6:00 a.m. on November 9, 2020; (2) police observed fresh footprints from dress shoes in the dew on the second-story patio and the stairs leading to the patio; (3) police observed a number of windows of the Property had been shattered; (4) K-9 Rookie, who was trained in detecting recent human odor, tracked recent human odor from the Property's second-floor patio directly to a pair of brown dress shoes on Appellant's front doorstep; (5) prior to the damage to the Property on November 9, 2020, Appellant had lost a civil suit he had filed against Mr. Reichlin (thus he had motive to damage the Property); (6) Appellant did not have permission to enter onto the Property (as an adjoining neighbor, Appellant would know that the Reichlins were away on November 9, 2020); and (7) the

Property's video surveillance showed, *inter alia*: (a) a person walking in Appellant's garage at 5:31 a.m.; (b) a person on Appellant's property holding an illuminated flashlight at 5:41:22 a.m.; (c) a person walking under the Property's patio at 5:44:31 a.m. while holding an illuminated flashlight in right hand and claw hammer in left hand; and (d) a person walking in Appellant's garage at 5:52:47 a.m. That person in the video appeared to be of Appellant's smaller stature.

Stated simply, the evidence produced supports Appellant's convictions for all the offenses charged, and the verdict does not shock the conscience of the Court.

Trial Court Opinion, 15-16.

Having reviewed the record ourselves, we find no abuse of discretion by the trial court. **See Commonwealth v. Rice**, 902 A.2d 542, 547 (Pa. Super. 2006) (where trial court's "conclusions are logical and supported by evidence of record," it then "did not commit a palpable abuse of discretion" by rejecting a weight claim). Moreover, the trial court's explanation decisively rebuts Appellant's assertion that "the entire case rests" on two items of proof: his alleged motive and Officer Stieber's allegedly improper identification. **See** Appellant's Brief, 12. It is clear there was more evidence establishing Appellant's guilt, and Officer Stieber neither identified Appellant on the video nor did the trial court say or write anything to indicate that it believed he had.

Appellant essentially asks this Court to substitute our evaluation of the quality of evidence for that of the trial court, which we cannot do. It would be reversible error for this Court to "step[] into the shoes of the trial judge and revisit[] the underlying question of whether the verdict was against the weight of the evidence." **Clay**, 64 A.3d at 1056. **See also Commonwealth v. Chine**, 40 A.3d 1239, 1244 (Pa. Super. 2012) ("[a]s it is not the role of an appellate

court to reweigh the evidence, we will not disturb the jury's credibility determinations"). Based on our review, all the alleged weaknesses in the evidence were brought to the attention of the trial court, which, as the fact-finder, was the final arbiter of credibility and weight. *See Commonwealth v. Small*, 741 A.2d 666, 673 (Pa. 1999) (where "all of the matters complained of by appellant … were issues argued by appellant's counsel during trial and were properly weighed and rejected by the [fact-finder] before it reached its verdict" then appellate weight claim fails). Accordingly, we find that the trial court did not abuse its discretion by denying a new trial.

In his final claim, Appellant argues that his convictions were reliant on the surveillance video, narrated by Officer Stieber in violation of the Rules of Evidence 901(a)(1) (authentication) and 602 (requiring a witness to have personal knowledge). *See* Pa.R.E. §§ 602, 901(a)(1). Appellant further argues that Officer Stieber "was allowed to identify [him] in the video" and that doing so where his testimony violated Rules 901 and 602 was "such an unduly suggestive procedure that it amounts to a Due Process violation," warranting suppression and exclusion. Appellant's Brief, 13. In support, he cites cases in which identification procedures were the subject of pretrial suppression hearings. *See id., citing Commonwealth v. Santiago*, 209 A.3d 912, 915–916 (Pa. 2019) (Santiago "filed an omnibus pre-trial motion seeking, *inter alia*, to suppress Officer Sanchez's anticipated testimony at trial regarding his out-of-court identification … and his in-court identification of Appellant at trial, asserting that any identification … by the officer would be solely the product

of the officer's unconstitutional warrantless search" of a cell phone); ***Commonwealth v. Mallon***, 421 A.2d 234, 237 (Pa. Super. 1980) (Mallon contended "that the pre-trial line-up was unduly suggestive. … The lower court held a hearing … during which a photograph of the line-up itself was introduced into evidence," but the court found Mallon's allegations "concerning the line-up were not supported by the facts").

Appellant contends that there must be "independent testimony establishing what was in the video before there can be narration of the video." Appellant's Brief, 14. He discusses our decision in ***Commonwealth v. Cole***, 135 A.3d 191 (Pa. Super. 2016), and concludes that it was the existence of testifying eyewitnesses to the shooting that permitted the officer to narrate the surveillance footage shown to the jury in ***Cole***. ***See*** Appellant's Brief, 14. He contends that Officer Stieber's testimony was improper because he gave the "time and complete narration of events that no one saw; and notably, the actual breaking of the windows is not captured in the videos[,]" particularly by: (1) stating that he could see "someone with a flashlight in [Appellant's] garage" at 5:39 a.m.; and (2) "the same figure, with a flashlight," walk to patio area of the Property "where the windows were later found [to be] broken." ***Id.***, 14-15. Appellant argues that this "evidence is entirely circumstantial but too weak without any suggestive narration from Officer Stieber to sustain a verdict beyond a reasonable doubt." ***Id.***, 15.

Appellant's claim combines constitutional concerns related to suggestive identifications with basic precepts of admissibility of evidence. Turning first to

Appellant's argument that allowing "the police [to] identify" him in the video was "such an unduly suggestive procedure" that it amounts to a due process violation, Appellant's Brief, 13, there are multiple reasons to deny relief. First, he raised it in a pretrial motion to suppress an identification by any police officer because it was "unduly suggestive that the suspects therein the video were persons with which these officers had previously investigated." Appellant's Motion in *Limine*, 1/17/24, 8-9. However, at the suppression hearing, Appellant did not state this theory as a basis for suppression, but limited the motion to the "men's shoes that were recovered without a search warrant from the front … entranceway of [Appellant's] home." N.T. 1/26/24, 6. He thereby abandoned any claim that there was an unduly suggestive identification procedure. ***See*** Pa.R.A.P. 302(a); ***Commonwealth v. Jones***, 193 A.3d 957, 964 (Pa. Super. 2018) ("A defendant cannot raise, on appeal, a claim that he was entitled to suppression on a theory he did not raise[]" before the trial court).

Second, Officer Stieber, who narrated the video at trial, did not identify Appellant as the figure seen on the video. Appellant refers to two points of his testimony, but neither is an identification of the figure seen on the video as being Appellant. ***See*** Appellant's Brief, 14-15.

> [THE PROSECUTOR]: Stopping the video at 17 minutes and 11 seconds.
>
> … Now, for purposes of the record, Officer Stieber, what is it that we just observed?

> [OFFICER STIEBER] … As you're watching, the lights in [Appellant's] garage had gone off and on repeatedly. There was a light being moved around inside the garage, which it would appear that **somebody** was walking around inside the garage with a flashlight
>
> [DEFENSE COUNSEL]: Objection.
>
> THE COURT: Sustained. It's up to me to determine what is on the video.
>
> [OFFICER STIEBER: Then you see a light up in the top right corner just to the left of that white line.

N.T. 1/26/24, 92-93 (emphasis supplied). To be clear, the officer knew the garage to be Appellant's and merely stated that it appeared that "somebody" was in the garage with a flashlight. He did not identify Appellant as being the person in the garage. Moreover, the court sustained the objection as to the officer's supposition of what it looked like was happening in Appellant's garage, stating that it would decide what was depicted on the video. In a similar vein, Officer Stieber stated that, on the video he could: "see a figure holding … some sort of lighted object and walking towards River Road;" "see a figure walk in the rear of the Reichlin residence which is 234 River Road walking west;" and the "subject appeared to have a flashlight in his right hand -- in their right hand and what appeared to be a claw-style hammer in the left hand." *Id.*, 93, 94.

The second alleged identification also was not an identification of Appellant:

> [THE PROSECUTOR]: … What else did you notice about the subject?
>
> [OFFICER STIEBER]: Just that he still had the light in his hand.

THE COURT: I'm sorry, sir. I understand what I just saw, what is the direction that the individual is walking from and to?

[OFFICER STIEBER]: Initially the subject walked from the east side of the property in the rear yard, walks west.

THE COURT: I understand that.

[OFFICER STIEBER]: -- underneath the patio up towards where the stairs were to the patio.

THE COURT: Okay.

[OFFICER STIEBER]: -- and then walks back underneath the patio again.

THE COURT: Towards where?

[OFFICER STIEBER]: Towards the east side of the residence, but initially underneath the patio where the windows in the storage area were broken.

N.T. 1/26/24, 96. At no point did Officer Stieber purport to identify Appellant as the figure in the video. *See also* Trial Court Opinion, 17 ("At trial, the police did not specifically identify Appellant"). It was the circumstantial evidence, including where the figure in the video came from and returned to that established it was Appellant who destroyed the windows on the Property.

We now turn to the admissibility of Officer Stieber's narration. In *Cole*, on which Appellant relies, we stated that:

> The admission of videotaped evidence is always within the sound discretion of the trial court and will not be reversed absent an abuse of that discretion. Admissibility depends on relevance and probative value. Evidence is relevant if it logically tends to establish a material fact in the case, tends to make a fact at issue more or less probable, or supports a reasonable inference or presumption regarding a material fact.

*Cole*, 135 A.3d at 194–195 (internal citations and quotation marks omitted). Appellant argues that Officer Stieber's testimony concerning what the videotape depicted violated the rules of evidence requiring authentication and personal knowledge. *See* Appellant's Brief, 13-15.

With respect to authentication of the videotape, counsel for the defense stipulated "to the authenticity of [the video]." N.T. 1/26/24, 89. The stipulation was sufficient to authenticate the surveillance video to be what it purported to be, that is, a surveillance video depicting the rear of the Property and a view from the Property towards Appellant's residence on the morning of November 9, 2020, from 5:29 a.m. to 5:55 a.m. *See* Pa.R.E. 901(a) ("**[u]nless stipulated**, to satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is") (emphasis supplied); *Commonwealth v. Perrin*, 291 A.3d 337, 345 (Pa. 2023) (generally, "parties may stipulate, and be bound by their acts as the law of the case, in all matters affecting them without affecting the jurisdiction and prerogatives of the court") (citation and quotation marks omitted). We find that it was not an abuse of discretion for the trial court to accept trial counsel's stipulation to the authenticity of the surveillance video.

Appellant also suggests that Officer Stieber did not have personal knowledge of what was depicted on the surveillance video. *See* Appellant's Brief, 13. The relevant rule of evidence provides:

A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may consist of the witness's own testimony.

Pa.R.E. 602.

Appellant contends that the officer could not testify to the contents of the video because he had not been present to see the figure travel from Appellant's property to the Property and back again, or the destruction of the windows at the Property, either in person or on the video. **See** Appellant's Brief, 13-15. We disagree. Officer Stieber had been at the scene on the morning of the November 9, 2020, "to assist in the investigation as the investigator." N.T. 1/26/24, 42-43. He was informed of the alarm activation, and of the discovery of broken windows "in the rear and side of the [P]roperty," and the K-9 track. **Id.**, 43. Further, Officer Steibel stated:

> I was brought around to the rear of the residence on -- as Sergeant Eckert testified -- the porch, the elevated porch in the rear of the property where numerous windows and doors were smashed out. They also pointed out to me that there were shoeprints in the dew of the patio.

**Id.**, 44. He also explained that the "surveillance video of the residence of [the Property] was provided to me I believe by … Mr. Reichlin's wife." **Id.**, 89. He was thus familiar with the Property and the surveillance video, and, as he testified, with what was depicted on the video:

> This camera is situated on the second floor of the Reichlins' residence. And the windows that you can see there in the video are of the garage door for [Appellant]. So[,] it points in a southwesterly direction. You can see there is a slight retaining -- or a retaining wall. It's not really a retaining wall, but a wall next to the garage windows. And where that car just went down, that

car was traveling eastbound on River Road. So[,] when it's lit up, you can see the front yard of [Appellant's] residence.

*Id.*, 90. The officer's testimony established that he had personal knowledge of the Property on the day of the incident and of the evidence gathered at the Property by police, including the location of surveillance cameras and the contents of the surveillance video.

Appellant nevertheless contends that *Cole* requires "independent testimony establishing what was on the video first before there can be narration of the video showing the events to be depicted." Appellant's Brief, 14. To the contrary, *Cole* announces no such requirement. Instead, we found, similar to here, that the detective who narrated the images depicted on the video had been to the location, had recovered and viewed the video, and:

[d]uring the course of his narration, [the detective] pointed out the time stamp at various points in the video; he described the location of the cameras to the scene, the physical relationships between people and buildings, and the movements of a vehicle; [and more].

*Cole*, 135 A.3d at 196. Thus, as in *Cole*, we conclude that the police officer's "testimony was based on his experience, his perceptions, and his personal knowledge of [the location of the crime]. His testimony was relevant to the [fact-finder's] understanding of the timing, the actors, and the location of events depicted in the video." *Id.* Moreover, the "testimony did not cause unfair prejudice or undue delay, confuse the issues, mislead the [fact-finder,] or needlessly present cumulative evidence." *Id.* Therefore, we discern no

abuse of the trial court's discretion in admitting Officer Stieber's testimony narrating the events depicted on the video.[4]

Accordingly, we affirm the judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

_Benjamin D. Kohler_

Benjamin D. Kohler, Esq.
Prothonotary

Date: 10/23/2025

---

[4] We note that defense counsel explicitly retained the right "to object to any narration or any conclusions or opinions on the video, but [will] wait to see if that occurs" during the testimony. N.T. 1/26/24, 89. Counsel objected at several points and most of these objections were sustained, as recounted by the trial court. **See** Trial Court Opinion, 16-19. In addition, the trial court explained that if it "did not permit Ofc. Stieber to narrate the video footage, the [c]ourt itself would have had to state for the record what the footage showed." **Id.**, 18.